In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1648

DAVID B. GICLA,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 7236—**Sidney I. Schenkier**, *Magistrate Judge*.

ARGUED JANUARY 13, 2009—DECIDED JULY 15, 2009

Before BAUER, POSNER, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Plaintiff-appellant David B. Gicla had his right-ankle joint replaced with an implant at a Veteran's Administration Medical Center in Chicago. After the implant failed to relieve the chronic pain and swelling that Gicla was experiencing, a series of five additional surgeries followed, culminating in the amputation of his right leg below the knee. Gicla filed this suit for malpractice against the United States and various

VA medical personnel pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* The individual defendants were dismissed from the suit, and the case was tried to the bench. The magistrate judge, presiding with the parties' consent, entered judgment in favor of the United States, finding that the VA medical personnel who treated Gicla did not breach the duty of care that they owed to him. Gicla appeals. He primarily challenges the district court's refusal to exclude the testimony of a defense expert for a purported violation of Federal Rule of Civil Procedure 26, after the expert disclosed on cross-examination that just before taking the witness stand he looked at x-rays that he had not previously reviewed in rendering his opinion on behalf of the United States. Gicla also contends that the district court erred in crediting the United States' witnesses over his own. Finding no error, we affirm the judgment.

In 1999, Gicla consulted with Dr. John Grady, director of the podiatry service at the Westside VA Medical Center in Chicago. Gicla had severe arthritis in his right ankle stemming from a fracture he suffered in a motorcycle accident some twenty years earlier, while he was serving in the U.S. Navy. The arthritis caused him to experience extreme pain and swelling. After non-surgical efforts at relieving his symptoms proved unsuccessful, and after discussing his options with Dr. Grady, Gicla agreed to have his ankle joint replaced using the DePuy Agility® Total Ankle System, an implant which had only recently been approved by the U.S. Food and Drug Administration. Gicla was 40 years old at that time.

The surgery, performed in April 1999, was the first occasion on which VA physicians had used the DePuy Agility® implant. Dr. Grady performed the surgery with the assistance of resident Dr. Jonathan Norton. During the procedure, they removed a screw that had been used to repair the facture Gicla had suffered years before. The head of the screw broke off as the surgeons tried to remove it. Because they lacked an appropriately-sized trephine to hollow out the bone around the screw and facilitate the screw's removal, they were forced to use an osteotome and mallet, which may have resulted in the removal of more bone surrounding the screw than a trephine would have. Also during the surgery, either when the implant was inserted or when the ankle was flexed following the implantation, the lower portion of Gicla's fibula (calf bone), also known as the lateral malleolus, cracked. Such fractures are a known risk of implant surgery. The surgery was otherwise uneventful.

The implant did not improve Gicla's discomfort, however, and a series of follow-up surgical procedures ensued. In July 1999, Drs. Grady and Norton removed a bony regrowth from his right ankle and lengthened his Achilles tendon to increase the range of motion in his foot. In August 2000, Dr. Grady removed the implant and the ankle joint was fused. One year after that, much of the remaining hardware in the ankle was removed. The following year, yet another surgery was performed in an effort to salvage the fusion. Still, Gicla continued to experience pain and difficulty using his right leg. Ultimately, in October 2003, Gicla had his right leg amputated eight to ten inches below

the knee. The final three surgeries were performed in Milwaukee, where the Giclas had relocated.

Gicla filed this suit in October 2003 complaining of medical malpractice. Gicla alleged that he was too young for the implant procedure performed in 1999 (given the expected life of the implant) and that he was not properly advised of the risks attendant to an ankle replacement. He also alleged that Drs. Grady and Norton made certain mistakes in performing the initial surgery in April 1999 and the follow-up surgery in July which contributed to the failure of the implant to resolve his discomfort, including using the wrong-sized implant, removing too much bone in extracting the broken screw, failing to use bone wax to prevent bone growth in unwanted areas (e.g., the area around the removed screw), fracturing his fibula, failing to stabilize the implant, failing to use a bone stimulator to hasten bone regrowth in desired areas, and damaging or displacing his deltoid ligament during the follow-up surgery.

At trial, Dr. George Vito testified as an expert witness on the government's behalf. Federal Rule of Civil Procedure 26(a)(2)(B) requires the party who proffers an expert to make certain pre-trial disclosures, including, among other things, (i) a statement of the opinions the expert will express, along with the bases and reasons for those opinions, (ii) any data or other information considered by the expert in forming his opinions, and (iii) any exhibits that will be used to summarize or support those opinions. If the initial disclosure is incomplete, or if there is a subsequent addition to or change in the information

disclosed, the expert's proponent has an obligation to supplement its disclosure pursuant to Rules 26(a)(2)(D) and 26(e). Rule 37(c)(1) in turn calls for the exclusion of an expert's testimony if the requisite disclosures have not been made, "unless the failure was substantially justified or is harmless." Consistent with Rule 26(a)(2)(B), the government in advance of trial disclosed Dr. Vito's opinions, the rationale for those opinions, and the information he considered in forming them. One source of information that Dr. Vito did not consult in forming his opinions was a series of twenty to thirty x-rays of Gicla's ankle that were taken at various times before and after his implant surgery in April 1999. Rather than reviewing the x-rays himself, Dr. Vito relied on the radiological findings as to what those x-rays revealed. This was known to Gicla's counsel, presumably as a result of both the government's Rule 26 disclosures and follow-up discovery as to Dr. Vito's opinions. Gicla's counsel planned to drive home this point in cross-examining Dr. Vito at trial and to suggest to the court that his opinions should be given less weight than Gicla's own expert, who had examined the x-rays. But when the time came to cross-examine Dr. Vito, Gicla's counsel was surprised to learn from Dr. Vito that he *had* reviewed the x-rays earlier that day, before he took the witness stand. Tr. 391. Dr. Vito confirmed that he had not looked at the x-rays in forming his opinions prior to trial; his first and only review of the x-rays had taken place earlier that day. Tr. 391-92. Dr. Vito also testified that the x-rays had not altered his views. "My opinion has not changed." Tr. 391. When asked if they had confirmed or

aided his analysis, Dr. Vito said that "if anything, they helped me expand upon my testimony right now . . . ." Tr. 392. But Dr. Vito never explained how the x-rays helped him to elaborate on his opinions, as Gicla's counsel elected not to question him further on that subject. Instead, he moved to strike Dr. Vito's testimony altogether.

Gicla's counsel took the position that it was a violation of the government's obligations under Rule 26 for Dr. Vito to testify as an expert when his opinions were now informed by his review of the x-rays, and when his belated review of those x-rays had not been disclosed to Gicla in accordance with the rule. Gicla was prejudiced by the violation, his attorney argued, because counsel had planned Dr. Vito's cross-examination believing that Dr. Vito had rendered his opinions without reviewing the x-rays. Dr. Vito's unexpected disclosure that he had taken a look at the x-rays and that they did not change his opinion blocked the line of attack that Gicla's counsel had intended to pursue and left him unprepared to question Dr. Vito about what he saw or didn't see in the x-rays. Counsel added that he was unable to consult with Gicla's expert (who was not present at the trial) in order to prepare appropriate questions for Dr. Vito now that Dr. Vito had seen the x-rays.

The district court declined to strike Dr. Vito's testimony. The court was critical of the government for having shown Dr. Vito the x-rays on the morning of his testimony. Tr. 397-99. The government obviously had done this to neutralize the anticipated cross-examination of Dr. Vito, Tr. 398, and in the court's view, the government should

have shown Dr. Vito the x-rays at an earlier date and disclosed this to the plaintiff, so that Gicla would have had an opportunity to question Dr. Vito before trial as to what the x-rays revealed, Tr. 398-99. But the court saw any violation of Rule 26(a)(2) as harmless. Tr. 396. In response to questions posed by Gicla's counsel, Dr. Vito had admitted that he formed his opinions without reviewing the x-rays; moreover, looking at the x-rays had not changed Dr. Vito's opinions. Tr. 395, 399. Gicla's counsel, in turn, agreed that Dr. Vito's testimony on direct examination did not deviate from the opinions disclosed prior to trial in accordance with Rule 26(a)(2). Tr. 399. The court offered Gicla's attorney a recess so that Gicla could determine what particular x-rays Dr. Vito had reviewed and consider what questions he might like to ask Dr. Vito about them before resuming his cross-examination. Tr. 394, 399-400. The court added that "if you have something else that you want, I'm willing to listen to you." Tr. 396. However, counsel declined the offer, Tr. 400, and instead elected to complete Dr. Vito's cross-examination without delving into the x-rays.

On appeal, Gicla renews his contention that Dr. Vito's belated review of the x-rays, without warning to the plaintiff, was a violation of Rule 26(a)(2) that was prejudicial to his case. He contends that the only proper way to address this violation was to strike Dr. Vito's testimony pursuant to Rule 37(c)(1). In Gicla's view, the exclusion of Dr. Vito's testimony would have so altered the balance of the evidence as to entitle him to judgment.

We review the district court's decision not to exclude Dr. Vito's testimony for abuse of discretion. *See, e.g., Jenkins*

*v. Bartlett*, 487 F.3d 482, 488 (7th Cir. 2007); *Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 739, 742 (7th Cir. 1998). We find no abuse of discretion in the manner in which the district court handled this issue.

We may assume without deciding that Dr. Vito's eleventh-hour review of the x-rays amounted to a violation of Rule 26 regardless of whether his opinions changed as a result of that review. By requiring the pre-trial disclosure of any expert testimony that a party intends to offer, along with the bases for the expert's opinions, Rule 26 is designed to avoid surprise and give the opposing party a full opportunity to evaluate the expert's methodology and conclusions and to respond appropriately. *See* Rule 26(a)(2) advisory committee's note, 1993 amendments. Dr. Vito formed his opinions as to the care provided to Gicla without reviewing the x-rays; he instead relied on the radiological reports. This gave Gicla an opening to attack the validity of Dr. Vito's opinions at trial that Gicla's counsel fully intended to exploit. At no time in advance of trial, and certainly not within the time set by the court for Rule 26 disclosures, did the United States disclose an intent to have Dr. Vito review the x-rays before he took the witness stand. Dr. Vito's unannounced review of the x-rays foreclosed to Gicla the line of attack his counsel had anticipated pursuing and, more pertinently, given the purposes of Rule 26, deprived him of forewarning as to the impact of the x-rays on Dr. Vito's thinking, the opportunity to question Dr. Vito on that point during discovery, and the ability to adjust his cross-examination at trial accordingly.

Still, as the district court noted, there is no evidence that Gicla was unduly prejudiced by the surprise. Although Dr. Vito did suggest that seeing the x-rays enabled him to "expand upon [his] testimony," Tr. 392, the court found, and Gicla's counsel conceded, that Dr. Vito's testimony on direct examination differed in no respect from the opinions disclosed prior to trial. Tr. 399. After his motion to strike that testimony was denied, Gicla's counsel opted not to cross-examine Dr. Vito about the x-rays and Dr. Vito made no other reference in his testimony to them. At most, it appears that Dr. Vito's review of the x-rays simply confirmed what he had already concluded. Tr. 391-92.

It is true that Gicla was deprived of his anticipated challenge to Dr. Vito's opinions, but that is not what Rule 26 was designed to protect. Trials serve a truth-seeking function, and if Dr. Vito's opinions were not altered by his review of the x-rays, then the factfinder was entitled to know that. The real harm was that Gicla and his counsel were deprived of the opportunity to know in advance of the trial that Dr. Vito's opinion was unchanged, and to prepare to cross-examine him on that point.

This is why it matters that the district court offered Gicla's counsel the opportunity to take a break in order to determine what x-rays Dr. Vito had reviewed and to ascertain whether he wished to cross-examine Dr. Vito on those x-rays. Gicla could have used that opportunity to determine what questions he might wish to ask of Dr. Vito knowing that Dr. Vito had now seen the x-rays.

We have recognized the propriety of such measures to correct Rule 26 violations. *See Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 752 (7th Cir. 2005). Gicla contends that this was an empty offer because his own expert was not present at the trial (the deposition of Gicla's expert was instead admitted into evidence by agreement) and was not immediately available for consultation, so there was no point in such a break. Yet, so far as the record reveals, Gicla's counsel never made an attempt to reach his expert. Even if his expert was unavailable at that moment, Gicla has not shown that his cross-examination of Dr. Vito would have been materially different had he not been caught by surprise by the belated disclosure that Dr. Vito had reviewed the x-rays. As we pointed out at oral argument, nothing would have prevented Gicla's lawyer from consulting with the expert at a later date and making a proffer of what he would have done differently had he received timely notification of the x-ray review. Nor was Gicla precluded from highlighting for the court the noteworthy information that his own expert had gleaned from the x-rays that Dr. Vito had (apparently) overlooked or discounted.[1] It is worth

---

[1] Having previously questioned Gicla's expert, Dr. David Plotkin (whose deposition was later admitted into evidence in lieu of his testimony at trial), Gicla's attorney was well aware of what Dr. Plotkin saw in the x-rays that he believed was indicative of negligence on the part of the VA physicians. *See*, *e.g.*, R. 85 at 35 (noting significant space around removed

(continued...)

pointing out that this was a bench trial, and there was an interim of nearly a week between the conclusion of the trial and the issuance of the magistrate judge's decision. Even after the decision was rendered, there was additional time in which to file an appropriate post-trial motion. So granting that it may have been difficult for Gicla's lawyer to make a more concrete showing of prejudice in the midst of trial, time remained afterward in which to make such a showing. Had Gicla taken the opportunity to demonstrate how he might have more effectively cross-examined Dr. Vito with timely notice that Dr. Vito had reviewed the x-rays, the court might have reconsidered its ruling, given Gicla the opportunity to re-call Dr. Vito to the stand or reopen the evidence for some other purpose, or granted Gicla a new trial.

---

[1] (...continued)

screw), 38-39 (noting void and trauma resulting from removal of screw, which, in Dr. Plotkin's view, led to bone spurs that required second operation, which in turn resulted in destabilization of ankle), 56 (noting "huge" space between tibia and fibula, which suggested that smaller implant should have been used), 57-58 (noting deviation and lack of stability owing, in Dr. Plotkin's view, to surgeon's failure to properly position, support, and protect lateral malleolus), 64 (noting that more of fibula was removed than recommended by implant manufacturer). We add that Dr. Grady too was questioned about certain of the x-rays by both the government and Gicla. *See*, *e.g.*, Tr. 172-175, 189-194, 200-03. So Gicla's counsel had some familiarity with the x-rays that would have helped him to make a showing of prejudice resulting from Dr. Vito's surprise disclosure.

But Gicla did not attempt to make a more convincing showing of prejudice. On this record, we cannot discern any concrete harm that Gicla suffered as a result of the unexpected disclosure.

The fact that this was a bench trial also served to minimize any prejudice to Gicla. The Magistrate Judge was aware of what had occurred, understood perfectly well that Dr. Vito had formed his opinions without looking at the x-rays, and also appreciated the fact that Gicla's counsel was put at a disadvantage at trial by the surprise disclosure.

One last point on this subject: Gicla presumes that had Dr. Vito's testimony been excluded, the deposition testimony of his own expert, Dr. David Plotkin, would have stood unchallenged, compelling the district court to find in his favor. For that reason, he contends that the error in allowing Dr. Vito's testimony entitles him to reversal with directions to enter judgment in his favor, or alternatively to a new trial.

But his presumption is flawed for multiple reasons. First, even if Dr. Plotkin's testimony had not been expressly contradicted by way of the government's expert, in no sense would the district court have been compelled to credit his opinions and render judgment for Gicla. The court could have found fault with Dr. Plotkin's analysis, for example. Moreover, Dr. Plotkin's opinion would not have been the sole opinion concerning the adequacy of Gicla's medical care even in the absence of Dr. Vito's testimony. The VA doctors who performed the implant surgery on Gicla also testified, and of course as his

treating physicians, they were qualified to offer opinions as to the propriety of the treatment he received. Like Dr. Vito, Dr. Grady was led through most if not all of the opinions that Dr. Plotkin had expressed (although Dr. Plotkin was not cited as the source of those opinions), and like Dr. Vito, Dr. Grady disagreed with them. Indeed, the district court's decision in favor of the government reflects that it did credit and rely upon the treating physicians' testimony in significant respects.

Which brings us to the final issue that Gicla raises: He argues that the district court erred in crediting the testimonies of Dr. Vito and the treating physicians over that of Dr. Plotkin and that the court's judgment in favor of the government was against the manifest weight of the evidence. As the basis for that argument, he relies on a variety of inconsistencies among the testimonies of the government's witnesses. For example, Dr. Vito thought that arthroscopy might have been an option for Gicla in the first instance, Tr. 389-90, but the testimonies of Drs. Grady and Norton reflected no discussion of arthroscopy with Gicla. Tr. 44, 51, 269-70, 297. In other instances, the physicians were in agreement on certain points as to the limitations or risks of the implantation procedure, but gave testimony that raised questions about whether their decisions were in accord with those known limitations and risks. For example, Dr. Grady testified that if a patient's ankle joint had deteriorated beyond a certain point, then an implant was not a viable option. Tr. 168-69. And when asked about what Gicla's pre-surgery x-rays showed about the condition of his ankle, Dr. Norton stated that "[h]e didn't have much of an

ankle joint left": the joint had no remaining cartilage and reflected deformity due to arthritis. Tr. 264, 265-66. Both doctors also indicated that Gicla's history of smoking and drug and alcohol abuse could interfere with his ability to successfully heal from the implant surgery. Tr. 33, 306, 309-10, 344-45. Yet, Dr. Grady was not certain how much they knew about this history before performing the implant, Tr. 33-34, and although Dr. Norton was aware of Gicla's history of smoking, he was unaware of his history of substance abuse, Tr. 306-08, 336.

As Gicla's argument recognizes, the ultimate decision in this case as to whether or not the VA physicians committed malpractice turned largely on the credibility of the witnesses. There were disputes between Mr. and Mrs. Gicla on the one hand and Gicla's treating physicians on the other as to some of the underlying facts—in particular, as to the options the physicians had discussed with Gicla prior to his implant surgery and the warnings they gave him about the risks associated with that surgery. Those types of disputes presented straight-forward credibility questions for the magistrate judge to resolve as the finder of fact. But there were also disputes of opinion among the parties' expert witnesses and the treating physicians. Although those professionals were commenting largely on the same body of evidence relating to Gicla's course of treatment, they came to directly contradictory conclusions as to what that evidence revealed about the propriety of the care Gicla received. Thus, when Dr. Vito testified on behalf of the government, he was walked through each of Dr. Plotkin's opinions as to the mistakes he believed Gicla's VA physi-

cians had made, and Dr. Vito rejected each of those opinions. So the case also presented a classic battle of the experts. And in that respect as well, the case called upon the factfinder to determine what weight and credibility to give the testimony of each expert and physician. *See United States v. Olofson*, 563 F.3d 652, 659 n.6 (7th Cir. 2009); *Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 994 n.6 (7th Cir. 1983); *see also Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010, 1020 (Fed. Cir. 2009); *Crowe v. Marchand*, 506 F.3d 13, 19 (1st Cir. 2007); *United States v. Uzenski*, 434 F.3d 690, 703 n.6 (4th Cir. 2006); *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005); *LePage's Inc. v. 3M*, 324 F.3d 141, 165-66 (3d Cir. 2003) (en banc); *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000). The credibility determinations that a judge renders as the finder of fact command a high degree of deference. *E.g., United States v. Longstreet*, ___ F.3d. ___, 2009 WL 1577692, at *10 (7th Cir. June 8, 2009). We will normally have no reason to disturb a court's evaluation of witness credibility unless the court has credited patently improbable testimony or its credibility assessments conflict with its other factual findings. *E.g., Kidd v. Ill. State Police*, 167 F.3d 1084, 1095 (7th Cir. 1999) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985)).

No such error occurred here. Although there were, as Gicla emphasizes, certain inconsistencies and vulnerabilities in the testimonies of the government's witnesses, nothing precluded the district court from crediting their opinions as to the propriety of the care that Gicla received. The testimonies of Drs. Vito, Grady,

and Norton were consistent with one another in important respects. Dr. Vito had significant experience with the type of implant surgery that Drs. Grady and Norton performed on Gicla, and of course as Gicla's treating physician the latter two were intimately familiar with his condition and the surgery they performed. Dr. Plotkin, by contrast, had no experience with the type of implant used on Gicla and in fact did not do implant surgeries, and he had never examined Gicla. The district court reviewed at length the testimonies of all four physicians and articulated cogent reasons for rejecting Dr. Plotkin's opinions and crediting the views of the government's witnesses. The court was aware of and addressed many of the points that Gicla has cited. It did not credit the government's witnesses across the board, although it ultimately did agree with them that Gicla's physicians did not provide him with substandard care. The court's factual findings, including its credibility assessments, are well supported by the record.

For all of these reasons, we reject Gicla's assignments of error and AFFIRM the judgment in the government's favor.