In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3953

GERALD MORISCH and BETTE MORISCH,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cv-145-GPM—**G. Patrick Murphy**, *Judge.*

ARGUED FEBRUARY 22, 2011—DECIDED JULY 29, 2011

Before WILLIAMS and TINDER, *Circuit Judges*, and
GOTTSCHALL, *District Judge.*[*]

TINDER, *Circuit Judge.* Gerald Morisch brought a
medical malpractice claim against the United States
under the Federal Torts Claims Act (FTCA), 28 U.S.C.

---

[*] The Honorable Joan B. Gottschall, United States District
Judge for the Northern District of Illinois, sitting by designation.

§§ 1346(b), 2671-80, after suffering a severe stroke in July 2003. He alleges that the medical personnel at the Veterans Administration (VA) hospital failed to take appropriate measures to determine that he was on the verge of a stroke and minimize the resulting damage. Bette Morisch, Gerald's wife, brought a loss of consortium claim against the VA that was later dismissed. Both plaintiffs also sued their former attorney, Robert D. Kreisman, P.C. (Kreisman), for legal malpractice. The district court held a four-day bench trial on the medical malpractice claim that was combined with a jury trial on the legal malpractice claim. The jury returned a verdict in Kreisman's favor and the district court later issued written findings of fact and conclusions of law on Gerald's FTCA claim, resulting in a judgment in the government's favor. The court concluded that Gerald failed to establish a violation of the standard of care and failed to prove that any act or omission of the VA proximately caused his injury.

The only substantive issue on appeal is Gerald's FTCA claim against the government. (The claim against Kreisman was apparently settled around the time of the verdict and the adverse jury verdict was not ultimately appealed). The plaintiffs testified that a few weeks before Gerald's stroke, Bette called VA hospital personnel on two occasions to notify them that Gerald was having stroke-related symptoms, but they did nothing. The district court discredited Bette's testimony in part because phone records failed to establish that those calls were made. Gerald argues that even assuming Bette's testimony was not credible, the district court

should nevertheless have considered the VA's breach of its standard of care in not properly following up with Gerald after VA doctors performed a computerized axial tomography (CT) scan of his neck and concluded that he should undergo a follow-up ultrasound. Gerald wasn't contacted about the need for the ultrasound until afer his stroke. If VA personnel had called him earlier, Gerald contends, he could have informed them about his symptoms, which should have prompted treatment.

An overarching procedural problem with Gerald's appeal limits our ability to address his claim. The only transcript from the bench trial that Gerald ordered and included in the record on appeal was the testimony of government expert witness Dr. Terrence Riley. This incomplete appellate record hinders our ability to conduct a meaningful review of the district court's findings. As such, we find that Gerald forfeited his appeal. We could end our discussion there, but we mention for completeness that based on the record available, the district court didn't err in concluding that Gerald failed to show that the VA's conduct was the proximate cause of his injury.

## I. Facts

On May 19, 2003, Gerald went to the emergency room of the VA Medical Center in Marion, Illinois. He complained of pain in his right jaw and neck. A physician prescribed pain medication and told him to see a dentist,

suspecting that Gerald had Eagle's syndrome.[1] Two days later, Gerald returned to the Marion VA hospital for a follow-up examination by Dr. James Richards, Gerald's primary care physician. Dr. Richards examined his neck and carotid arteries and referred him to an ear, nose and throat (ENT) specialist at the VA Medical Center in St. Louis, Missouri. Dr. Richards counseled Gerald about weight, cholesterol, and blood pressure, which are risk factors for stroke. Dr. Riley, a neurologist who testified on behalf of the government, opined that there was no reason to believe that Gerald had carotid artery disease or was at risk for an imminent stroke and that referring Gerald to an ENT doctor was the appropriate next step. (Excerpt Trial Tr. (Dr. Riley's testimony), 11-12).

Gerald saw Dr. Dun Ha, an ENT specialist at the St. Louis VA hospital, on June 16, 2003. After examining Gerald, Dr. Ha noted a small mass in his right neck. She

---

[1] Eagle's syndrome involves a thin bone at the base of the skull called the styloid process. It is a condition where the styloid process becomes elongated, often associated with weakness in and calcification of a ligament attached to the styloid process known as the stylohyoid ligament, causing recurring pain in the ear, neck, and throat. *See* Vittorio Rinaldi et al., *Eagle Syndrome,* MEDSCAPE REFERENCE (MARCH 26, 2010), http://emedicine.medscape.com/article/1447247-overview; *see also* Victor B Feldman, *Eagle's Syndrome: A Case of Symptomatic Calcification of the Stylohyoid Ligaments,* 47 J. CAN. CHIROPR. ASSOC. 21. (2003),available at www.baillement.com/atm/eagle-syndrome-feldman.pdf

performed a needle biopsy of the mass and ordered a CT scan of Gerald's neck. Dr. Riley testified that the mass was not a warning sign that Gerald was at risk for an imminent stroke. (Riley Tr. 13). Dr. Gracy Thomas, a radiologist at the St. Louis VA hospital, performed the CT scan on June 30, and interpreted the scan. He indicated that atherosclerotic changes were noted in the visualized portions of the upper aorta and suggested (internally) a follow-up evaluation by ultrasound. The impression stated: "For palpable masses, a follow-up evaluation by ultrasound is suggested." No one informed Gerald of the result of the biopsy (which was negative) or the CT scan; no ultrasound was ever scheduled.

The plaintiffs testified that on June 16 and June 30, 2003, Bette called the St. Louis VA hospital informing them of transient ischemic attack (TIA, also referred to as mini-stroke) symptoms that her husband was experiencing. They testified that while they were driving back home from Gerald's examination by Dr. Ha, Gerald experienced tingling and numbness in his left arm. At her deposition, Bette testified that she contacted the St. Louis VA hospital via cell phone to alert VA personnel that Gerald was undergoing TIAs. The plaintiffs also testified that while driving back home after the CT scan by Dr. Thomas, Gerald experienced numbness in his left arm and temporary blindness. Bette testified again at her deposition that she contacted the St. Louis VA hospital via cell phone to alert VA personnel to Gerald's condition.

On July 13, 2003, after having more signs and symptoms of an impending stroke, Gerald went to Massac Memorial

Hospital in Metropolis, Illinois, and from there was transferred to Lourdes Hospital in Paducah, Kentucky. Dr. John Grubbs accepted Gerald's transfer to Lourdes. Gerald complained of weakness and numbness in his left arm and left facial drooping. He was diagnosed with right internal carotid artery stenosis with an acute stroke. Lourdes performed emergency carotid endarterectomy (surgery to remove plaque buildup in the carotid arteries, *see* Healthwise Staff, *Carotid Endarterectomy for TIA and Stroke*, WEBMD (Jan. 7, 2011), http://www.webmd.com/stroke/carotid-endarterectomy-for-tia-and-stroke; however, Gerald had already suffered damage from the stroke. On July 15, 2003, Bette received a phone call from the St. Louis VA hospital informing her that Gerald needed an ultrasound.

Dr. Riley testified that the results of the CT scan and biopsy should have been relayed to Gerald and not relaying those results is a violation of the standard of care. (Riley Tr. 45, 48-49). He also testified, however, that it was not urgent to relay the results and opined that "there [was] nothing in this CAT scan that [was] more urgent than two or three months." (*Id.* at 49). Dr. Riley further testified that the finding of atherosclerotic changes in Gerald's CT scan was not a cause for alarm and is universal to some degree in Americans over the age of 50. (*Id.* at 14-15) According to Dr. Riley, a finding of atherosclerosis does not suggest the need for an emergency carotid ultrasound and in fact, without other symptoms, does not suggest the need for one at all. (*Id.*). He explained that the VA doctors were looking for a mass, and because they did not find it on the CT scan, they were going to follow up with an ultrasound. (*Id.* at

15). Based on the results of the CT scan, Dr. Riley opined that Dr. Thomas would recommend a static ultrasound, which would not have detected a blockage of Gerald's carotid artery. (*Id.* at 16). Instead, the VA would have needed to do a doppler ultrasound to find blockage and the results of the CT scan did not suggest a need for this type of ultrasound. (*Id.* at 17).

Dr. Riley also testified that even if VA doctors had examined Gerald, found an occlusion, and performed the carotid endarterectomy, these actions wouldn't have prevented the type of stroke Gerald suffered. (*Id.* at 28-29). Gerald had a "lacunar infarction," which causes a very small, discrete, dense lesion in a small, discrete place in the brain. (*Id.* at 19). As such, Dr. Riley testified that Gerald's stroke was not caused by atherosclerosis and was unrelated to his carotid artery. (*Id.* at 39, 55). Gerald's stroke, according to Dr. Riley, was not detectable before July 13. (*Id.* at 56). Dr. David Schreiber, a neurologist who testified on behalf of Gerald, opined that a carotid endarterectomy would have made the damage resulting from the stroke minimal; Dr. Riley disagreed with this assessment. (*Id.* at 23-24). Dr. Schreiber, however, testified that he doesn't criticize the VA doctors for what they did before receiving the phone call from Bette. (Schreiber's Dep. at 93:9-93:24)[2]. He stated: "The phone call . . . is the thing. It says he's having a stroke." (*Id.*).

---

[2] *See* Significant Facts Pertaining to the Liability of the Veterans Administration, *Morisch v. U.S.*, 3:07-cv-145, ECF No. 156, p. 10.

At trial, Dr. Thomas, Dr. Riley, and Dr. Schreiber testified that nothing in the CT scan of Gerald's neck suggested a need for emergency treatment. "Dr. Schreiber testified at trial . . . that, assuming that the cell phone calls in fact were made, the failure of the VA promptly to act on Mrs. Morisch's information was a breach of the standard of care. As Dr. Schreiber testified also, however, if the calls were not in fact made, there was no breach of the standard of care because, as noted, nothing in the CT scan of Mr. Morisch's neck suggested that Mr. Morisch required emergency treatment." *Morisch v. United States*, No. 07-145-GPM, 2009 WL 3349541, at *1 (S.D. Ill. Oct. 15, 2009). Based on the testimony presented, the district court reasoned that the central issue was whether Bette made the phone calls to VA personnel and alerted them of Gerald's symptoms that indicated an impending stroke.

Cell phone records did not reflect any call by either Gerald or Bette to a telephone number maintained by the VA on June 16 or June 30. At trial, Bette shifted her testimony and stated that she in fact contacted the VA via her home telephone, possibly using a calling card. She also testified that after June 30, but before July 13, she continued to attempt to contact the VA regarding her husband's condition. The district court did not credit Bette's testimony for several reasons: (1) she contradicted her deposition testimony and sworn answers to interrogatories where she said she used a cell phone and did not attempt to contact the VA regarding her husband's condition after June 30; (2) her trial testimony didn't make sense because there would be no reason

for her to use a telephone calling card to contact the VA when she conceded that she was familiar with and had used in the past the VA's toll-free 1-800 number; (3) it was unclear why the plaintiffs would contact the St. Louis VA hospital if Gerald was experiencing TIAs instead of contacting his primary care physician or taking him to the emergency room; and (4) there were no records indicating that she made the calls from her home phone. The district court concluded that the phone calls were not made, and thus, as conceded by Dr. Schreiber, that the VA medical personnel didn't breach the duty of care owed to Gerald.

In a footnote, the court also found that the plaintiffs failed to prove proximate causation. The court stated:

> At trial Dr. Riley testified that an examination of Mr. Morisch's neck could not have disclosed an imminent stroke because the situs of the stroke was inside Mr. Morisch's brain, not his neck, and that an ultrasound evaluation of the type recommended by Dr. Thomas could not have detected a blockage in Mr. Morisch's carotid artery such as would have been likely to lead to a stroke. The Court credits Dr. Riley's testimony.

*Morisch*, 2009 WL 3349541, at *2 n.2.

## II. Discussion

We must first address a side issue raised by the plaintiffs. Although the plaintiffs settled their claim with Kreisman, they still raised the following issue in their

brief: whether the district court erred in denying plaintiffs' motion for sanctions against Kreisman for violation of the *Petrillo* doctrine. Gerald maintains that resolution of that issue affects his case against the government. We briefly address this meritless argument and then move on to a discussion of Gerald's FTCA claim and his failure to supply this court with an adequate record on appeal.

### A.  Violation of the *Petrillo* doctrine

The plaintiffs appealed the district court's order denying their motion for sanctions against Kreisman in the legal malpractice claim for violation of Illinois' *Petrillo* doctrine. This doctrine prohibits defendants and their attorneys from engaging in *ex parte* discussions with the injured plaintiff's treating physicians. *See Petrillo v. Syntex Labs., Inc.*, 499 N.E.2d 952, 957 (Ill. App. 1986). The court may impose sanctions against a party who violates the *Petrillo* doctrine. *See Nastasi v. United Mine Workers of Am. Union Hosp.*, 567 N.E.2d 1358, 1365 (Ill. App. Ct. 1991) ("Where an *ex parte* communication has taken place between defense counsel and a plaintiff's treating physician, sanctions may be imposed upon the defendant, including reversal of the judgment in favor of the defendant and the award of a new trial."). The plaintiffs sought sanctions against Kreisman, alleging that its counsel violated the *Petrillo* doctrine by communicating with Gerald's treating physician, Dr. Grubbs. They asked the court to strike Kreisman's answer and enter a judgment in their favor, or alternatively, they argued that Kreisman

should have at least been barred from cross-examining Dr. Grubbs if called as a witness.

Although the plaintiffs settled with Kreisman and dismissed the firm from this action, Gerald nevertheless continues to press the *Petrillo* violation on appeal, asserting that the violation prevented him from calling Dr. Grubbs as a witness in his case against the government. According to Gerald, Dr. Grubbs testified at his deposition that Gerald had signs and symptoms of a stroke which could have been diagnosed by VA doctors if he had been properly monitored. Plaintiffs' counsel, however, argues that he could not have possibly called Dr. Grubbs as a witness after he had been tainted by Kreisman's counsel.

The district court found that "the law of Kentucky, which recognizes no physician-patient privilege, applies to the ex parte contacts between Kreisman and Dr. Grubbs . . . , thus defeating the basis for the motion." *Morisch v. United States*, No. 07-145-GPM, 2009 WL 6506656, at *5 (S.D. Ill. June 16, 2009). Gerald argues that Illinois law should apply. We can swiftly address Gerald's *Petrillo* violation argument without deciding which state law applies. Gerald doesn't argue that the government violated the *Petrillo* doctrine, and if he believed that Kreisman's alleged violation of the doctrine prejudiced his case against the government, he should have sought separate trials or asked for the jury to be removed while he examined Dr. Grubbs on his FTCA claim; he didn't. We don't see why, and Gerald doesn't explain why, the government should be held

accountable for another party's alleged violation of the *Petrillo* doctrine. Similarly, we cannot see how the district court's order denying the plaintiffs' motion for sanctions against Kreisman prejudiced him as to his claim against the government. This argument borders on frivolous. We move on to his FTCA claim, which fares no better.

## B. FTCA Claim

On appeal from a decision rendered in a bench trial, we review legal conclusions de novo and factual findings for clear error. *See Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005) ("After a full bench trial, the district court's findings of fact may not be set aside unless they are clearly erroneous."). Mixed questions of law or fact that do not involve constitutional rights are normally reviewed for clear error. *Id.* This is a highly deferential standard. *Id.* "[I]f a factual finding is plausible in light of the record viewed in its entirety, we may not reverse that finding even if we would have decided the matter differently had we been the trier of fact." *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) (quotations omitted). If we harbor reasonable doubts, they "should be resolved in favor of the district court's ruling in light of its greater immersion in the case." *Id.* (quotations omitted). "A finding of fact is clearly erroneous only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 847 (7th Cir. 2005).

"The credibility determinations that a judge renders as the finder of fact command a high degree of deference." *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009). We don't "disturb a court's evaluation of witness credibility unless the court has credited patently improbable testimony or its credibility assessments conflict with its other factual findings." *Id.* This is because the "trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony." *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004) (quotations omitted). In a case of dueling experts, such as this one, "it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008); *Gicla*, 572 F.3d at 414 (stating that the factfinder must determine what weight and credibility to give the testimony of each expert and physician).

### 1. Incomplete Record on Appeal

Gerald only submitted the trial transcript of Dr. Riley as part of the record on appeal; he did not request that the transcript of the entire bench trial be included in the record. Rule 10(b)(2) of the Federal Rules of Appellate Procedure provides: "If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion." Fed. R. App. P. 10(b)(2). He also did not follow the requirements of Appellate Rule 10(b)(3), which requires an appellant who

has not filed a complete transcript of the trial to file a statement of the issues the appellant intends to present on appeal and to serve it on the appellee. Fed. R. App. P. 10(b)(3).

A violation of Rule 10(b)(2) is grounds for forfeiture and dismissal. *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 573-74 (7th Cir. 1995). We will dismiss an appeal if the absence of the transcript precludes meaningful review. *Piggie v. Cotton*, 342 F.3d 660, 663 (7th Cir. 2003). The appellant has the burden of ordering the necessary transcripts; when challenging the sufficiency of the evidence, this includes the trial transcript. *Birchler v. Gehl Co.*, 88 F.3d 518, 519 (7th Cir. 1996) (part of transcript not sufficient under the rule); *see also Gramercy*, 63 F.3d at 573-74 (transcript must be included when party challenges sufficiency of evidence). In *Hotaling v. Chubb Sovereign Life Insurance Co.*, 241 F.3d 572, 581 (7th Cir. 2001), the plaintiff appealed the district court's findings after a bench trial, arguing that there was insufficient evidence to find for the defendants. We were unable to address his insufficiency claim, however, because he failed to file a copy of the transcript of the bench trial. *Id.* Accordingly, we held that the plaintiff forfeited the argument on appeal. *Id.; see also Lampley v. McBride,* 207 F. App'x 649 (7th Cir. 2006) (unpublished) (finding that we couldn't conduct meaningful appellate review of trial record and district court's findings from the bench trial where appellant didn't include trial transcript in the record).

Rule 10(b)(2) requires that the record include a transcript of all evidence relevant to the court's findings

or conclusions. In this case, that would include all portions of the trial relating to Gerald's FTCA claim. The only portion of the bench trial transcript provided by Gerald is the transcript of Dr. Riley's testimony. Gerald argues that Dr. Riley's testimony precludes a finding in the government's favor, but in making this argument, he misapplies the applicable standard of review. He attempts to show that there was some evidence presented at trial that supports his theory. This may be sufficient to pass muster under the summary judgment standard, where we view the evidence in the light most favorable to the nonmovant, but it cannot succeed upon review of a bench trial where we review factual findings for clear error. What is perhaps most troubling is Gerald's almost complete reliance on allegations in his complaint to support his arguments on appeal. Although we acknowledge that most of his stated factual contentions are not in dispute, it is inappropriate to rest on conclusory allegations of the complaint at this stage of the game.

The district court was permitted to consider all the evidence at trial and make factual findings based on that evidence. We review those findings under a deferential standard, but we cannot engage in a meaningful review of those findings when we only have the trial testimony of one of several witnesses who testified. The government, who was satisfied with the trial court's findings, had no obligation or incentive to order the transcripts. Gerald must convince us that the trial court erred, and he cannot meet this burden without providing us with the record of the bench trial. (In fact, in his reply brief, which was stricken for being late, Gerald urges us to

consider cited portions of Dr. Schreiber's testimony, even though it's not in the record.) Without the transcripts, "we are unable to evaluate the evidence submitted in this case," *Hotaling*, 241 F.3d at 581, and cannot conduct a meaningful review of Gerald's claim, *see Birchler*, 88 F.3d at 519-20.

As an alternative to forfeiture, we have the authority under Rule 10(e) to order the plaintiff to supplement the record to include the entire trial transcript. See Fed. R. App. P. 10(e). We have declined to allow supplementation, however, where, as in this case, the plaintiff had ample opportunity to correct the problem, but failed to do so. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 731 n. 10 (7th Cir. 2003); *see also RK Co. v. See*, 622 F.3d 846, 853 (7th Cir. 2010) (dismissing appeal where appellant was given ample time to correct the omission of the relevant transcript and failed to do so). In its response brief and at oral argument, the government pointed out that Gerald violated Rule 10(b)(2) by submitting an incomplete record on appeal. Despite notice of the government's objection to the incomplete record, Gerald made no attempt to supplement the record. His claim is therefore forfeited.

### 2.  Standard of Care and Proximate Cause

Although our discussion could end here, we briefly address the merits of Gerald's claim based on the record and undisputed facts before us. The FTCA imposes liability "under circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred . . . ."). The acts or omissions that are central to the medical malpractice claim occurred in Missouri, but since neither party pointed to a conflict between Missouri and Illinois law, the district court did not need to make a choice of law decision and assumed Illinois law applied. *Morisch*, 2009 WL 3349541 at *1. Neither party takes issue with the district court's determination to apply Illinois law, so that is the law we apply here. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir. 1993) ("[T]he parties have not identified a conflict between the two bodies of state law that might apply to their dispute, [so] we will apply the law of the forum state—here, Illinois."); *see also Kochert v. Adagen Medical Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007).

To succeed on his medical malpractice claim, Gerald had to prove: "(1) the proper standard of care against which the defendant's conduct is measured; (2) an unskilled or negligent failure to comply with the applicable standard; and (3) a resulting injury proximately caused by the defendants want of skill or care." *Petre v. Cardiovascular Consultants*, 871 N.E.2d 780, 790 (Ill. App. Ct. 2007). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Johnson v. Loyola Univ. Med. Ctr.*, 893 N.E.2d 267, 272

(Ill. App. Ct. 2008) (quotation omitted). To establish proximate cause, the plaintiff must show "cause in fact and legal cause." *Bergman v. Kelsey*, 873 N.E.2d 486, 500 (Ill. App. Ct. 2007) (quotation omitted). "Cause in fact exists when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Coole v. Cent. Area Recycling,* 893 N.E.2d 303, 310 (Ill. App. Ct. 2008) (quotation omitted). "[T]o prove legal cause, a plaintiff must also show that an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *LaSalle Bank, N.A. v. C/HCA Devel. Corp.*, 893 N.E.2d 949, 970 (Ill. App. Ct. 2008) (quotations omitted).

We initially note that the district court did not err in finding that Bette was an incredible witness. Her testimony was unsupported by phone records, inconsistent with prior testimony, and questionable. The judge acted well within his bounds in disregarding the testimony. *See Gicla*, 572 F.3d at 414. Gerald, however, argues that even disregarding Bette's testimony, had VA personnel contacted him about the results of his biopsy and CT scan, he would have informed them about his TIA symptoms, which should have prompted a complete stroke work-up. If this is Gerald's argument, it's unclear why he didn't inform VA personnel of these symptoms at his June 30 ultrasound (he testified that he first had the symptoms on June 16). In any event, Dr. Riley testified that the standard of care didn't require the VA doctors to follow up with Gerald immediately. Neither the biopsy nor the ultrasound should have alerted the VA doctors that Gerald was at imminent risk of an impending stroke or that emergency

treatment was required. The plaintiffs' expert conceded this fact. That is key because Gerald's stroke occurred less than two weeks after his CT scan. The district court properly credited Dr. Riley's testimony that the VA doctors had no reason to know that Gerald needed urgent care before his stroke on July 13.

Gerald's stroke was not a foreseeable result of the VA's failure to follow up with him immediately about the results of his biopsy or CT scan. Nothing would have led the doctors to believe that Gerald was at imminent risk of a stroke or that by calling him, they would have discovered his TIA symptoms and prevented his injury. Even if they had called and Gerald informed them of his symptoms, according to Dr. Riley, no treatment of the carotid, such as carotid endarterectomy, could have prevented or lessened the effects of Gerald's stroke, which was caused by a small, discrete lesion in his brain. *See, e.g., Aguilera v. Mt. Sinai Hosp. Med. Ctr.*, 691 N.E.2d 1, 6 (Ill. App. 1997) (upholding entry of judgment notwithstanding the verdict where there was no evidence to support the opinion of plaintiff's experts that the negligent delay in administering a CT scan lessened the effectiveness of treatment). The district court acted within its discretion in crediting Dr. Riley's expert testimony and finding no proximate cause.

### III. Conclusion

For the foregoing reasons, the appeal is DISMISSED.

7-29-11