# Illinois Official Reports

## Appellate Court

---

*Board of Library Trustees v. Board of Library Trustees*,
**2015 IL App (1st) 130672**

---

| | |
|---|---|
| Appellate Court Caption | THE BOARD OF LIBRARY TRUSTEES OF THE VILLAGE OF MIDLOTHIAN, Plaintiff-Appellee and Cross-Appellant, v. THE BOARD OF LIBRARY TRUSTEES OF THE POSEN PUBLIC LIBRARY DISTRICT, Defendant-Appellant and Cross-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-13-0672 |
| Filed | June 3, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-5447; the Hon. Joan E. Powell, Judge, presiding. |
| Judgment | Reversed and remanded with directions to enter summary judgment in favor of defendant-appellant. |
| Counsel on Appeal | Peter M. Murphy, of Palos Heights, for appellant.<br><br>Leahy, Eisenberg & Fraenkel, Ltd., of Chicago (Howard B. Randell, Roland S. Keske, and Peter T. Cahill, of counsel), for appellee. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Pucinski and Justice Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff-appellee Board of Library Trustees of the Village of Midlothian (Midlothian) filed a breach of contract suit against defendant-appellant Board of Library Trustees of the Posen Public Library District (Posen). The trial court granted Midlothian's motion for summary judgment on liability and amounts due under the contracts and, after a hearing on prejudgment interest, entered a judgment against Posen for a total of $173,297 in damages, $121,294.33 in prejudgment interest from August 2007 through December 2012, and $14,996.49 in unpaid late fees. On appeal, Posen contends the trial court erred in granting summary judgment because (1) the performance of the parties modified the terms of the written contracts; (2) the trial court incorrectly rejected Posen's affirmative defenses of equitable estoppel, *laches*, and accord and satisfaction; (3) the damages evidence was insufficient to sustain a judgment; and (4) Midlothian is not entitled to prejudgment interest. On cross-appeal, Midlothian contends that the trial court erred in awarding prejudgment interest only from 2007 rather than from 2001. Finding that summary judgment for Midlothian was improperly granted, we reverse the judgment of the circuit court of Cook County and remand with directions.

¶ 2                                                    BACKGROUND

¶ 3     Midlothian and Posen are neighboring villages in Cook County. Because the village of Posen does not have a public library, Posen entered into a series of agreements with Midlothian to allow Posen residents to use Midlothian's public library. There are four agreements at issue in this dispute spanning the period July 1, 1998 through June 30, 2009, with one agreement covering a two-year period and each of the remaining three covering three-year periods.

¶ 4     Under the terms of the agreements, in exchange for the use of Midlothian's services and facilities, Posen agreed to pay "an amount equal to the greater of $40,000.00 or 87.00% of Posen's annual general corporate fund levy extended at the rate of .17% times the annual equalized assessed valuation [(EAV)] of all taxable property located within the [library district]." The payments were to be made biannually, with $25,000 due by July 1 of each year and the remaining balance due by December 31.

¶ 5     The first agreement, which covered the three-year period from July 1, 1998 through June 30, 2001, did not contain a penalty provision for unpaid amounts and payments were based on data from tax years 1997, 1998 and 1999. The remaining three agreements contained a clause providing that in the event the payments were not timely made, a penalty for the unpaid amounts would be assessed monthly "in the identical percentage of interest paid by Illinois Funds." The second agreement, the only two-year agreement, covered the period from July 1, 2001 through June 30, 2003, and was based on data from tax years 2000 and 2001. The remaining agreements were each for three-year periods (July 1, 2003 through June 30, 2006 and July 1, 2006 through June 30, 2009) and were based on tax data from 2002 through 2007.

¶ 6     In May 2009, Posen rejected a renewal contract proposed by Midlothian that would have required a higher payment and instead contracted with another village for library services. Midlothian then filed a complaint alleging breach of contract and unjust enrichment in which it claimed that Posen historically underpaid under the contracts. During discovery, both Mary

Beth Sharples, the director of the Midlothian board, and Susan Quirk, the president of the Posen board until 2008, were deposed and we summarize their testimony as relevant to the issues on appeal.

¶ 7 Carolyn Peterson, who is now deceased, was the director of Midlothian at the time of the first agreement. In February 2002, during the period covered by the second agreement, Sharples became the director. After familiarizing herself with the Posen agreement, Sharples sent a memo to the Posen board dated October 1, 2002, in which she detailed the calculation she was using to determine the amount of the second installment. The formula used by Sharples was EAV x .0017 x .87. There was no mention of the corporate fund levy in the memo. The memo showed that the EAV for tax year 2001 was $38,558,251. Sharples multiplied that total by .0017 to obtain a total of $65,549, which she then multiplied by .87 for a total due to Midlothian of $57,027. After subtracting the $25,000 payment made by Posen in June 2002, Sharples informed Posen that the second installment due by December 31, 2002, was $32,027. Posen made a payment in that amount. There is no record of Sharples sending a similar memo in any other year for the duration of the agreements. Moreover, the record shows that Sharples mistakenly used the incorrect EAV in her calculation, resulting in an alleged underpayment of $1,428 for 2002.

¶ 8 In 2001, Posen paid a total of $50,000 under the contract. In 2002, after receipt of the memo from Sharples, Posen paid a total of $57,027. In 2003 and 2004, Posen paid a total of $50,000 each year. From 2005 through 2008, Posen paid a total of $58,246 each year. Quirk testified that every year Midlothian would tell her the amount of the second installment due under the contract and she would pay the specified amount. During the time Peterson was the director, she would call or send a fax to let Quirk know the amount of the second installment. No documents in the record evidence these communications. Quirk stated she did not know where the numbers came from and did not know how Midlothian performed the calculation but just always assumed she was being given the correct amount Posen needed to pay. When Sharples became the director, Quirk received the memo from her in 2002 with the amount of the second installment, but could not remember who from Midlothian told her the amount of the second installment for the remaining years after 2002.

¶ 9 In 2000, Posen's general corporate fund levy was $60,851. Posen's levy increased slightly each year for tax years 2001 through 2003. It then remained at the 2003 level of $66,950 through 2007. Over that same time period, the EAV of real property within Posen's library district increased dramatically from $38,295,719 in 2000 to $65,341,453 in 2007.

¶ 10 There is no record of any dispute over payment amounts prior to 2007. Posen made payments in two installments every year, and Midlothian continued to provide library services to Posen residents and renew the contracts as they expired. In 2007, Midlothian residents passed a referendum increasing their levy for library services from 21 cents to 42 cents per $100 of assessed value. Sharples testified that Midlothian was frustrated that Midlothian residents were paying 42 cents while Posen residents were effectively paying 11 cents. Sharples then looked at Posen's EAV for the 2005 tax year and, using the formula EAV x .87 x .0017 (the same formula she used in 2002), determined that Posen underpaid in 2006 in the amount of $29,886.

¶ 11 Sharples attended a Posen board meeting in 2007 and advised the board of the underpayment for 2006. The Posen board informed Sharples that it could not make up the underpayment and she suggested that the board increase Posen's tax levy in order to obtain

the additional money. Sharples testified that she informed Posen at the meeting that Midlothian had noticed Posen was not "up to the terms of the contract" and should be looking at and trying to increase its levy. Sharples further explained: "At that point we knew there was a problem with the 17 cents and that we wanted them to at least attempt under the tax cap to start to raise their levy, the legal number under the tax cap to try and get back up."

¶ 12    Sharples testified that in 2007 and 2008, she "started to ask Posen to look at raising their levy 5 percent or the cost of living, whichever is less which we can do under the PTELL [Property Tax Extension Limitation Law] tax cap legislation." At the 2007 meeting, Posen also discussed increasing its budget by 5%. Sharples suggested that instead of spreading the 5% increase out over all the budget lines, it should all be put into the new contract with Midlothian. When the tax levy for Posen was published in late 2007/early 2008, Sharples noticed it had not increased and contacted Quirk to ask why Posen had not followed her suggestion. Quirk told Sharples that Posen's attorney would not let the library board increase its levy.

¶ 13    In June 2008, Sharples sent a memo to Posen, again requesting that the tax levy be raised because she knew the contract would expire in 2009. In the memo, Sharples stated that she believed the entire 5% increase that had been discussed at the previous meeting should go to the Midlothian contract line to bring it up to $54,250, which would bring Posen closer to the terms of the contract and show good faith to the Midlothian board. At her deposition, Sharples explained that she wanted Posen to increase its tax levy, and if Posen increased the levy, it should put the total amount of the increase into the budget line for Midlothian rather than spreading it over all of the budget lines. She was not asked to explain the $54,250 figure and how that related to the levy at that time of $66,950 or Posen's annual payment at that time of $58,246, which was 87% of the levy.

¶ 14    In 2008, auditors for Midlothian discovered that in 2007, Posen's second installment was only $25,000 rather than the $33,246 it had been paying. It is apparent from the record that when this was brought to Posen's attention, the difference of $8,246 was paid because Midlothian's payment records show that Posen paid a total of $58,246 in 2007 (for tax year 2006). There is nothing in the record to indicate Midlothian requested a different payment amount based on the auditor's findings. However, Sharples testified that after the auditors found this error, she went back and looked at the figures for 2001 to 2007 and, using the EAV information from the assessor's office, determined that there had been an underpayment every year, including 2002, the year she sent the memo with the amount of the second installment. There is nothing in the record to indicate Sharples conveyed this information to Posen or that any demand for payment on the basis of these calculations was made at that time.

¶ 15    After Quirk's resignation from the Posen board in 2008, the new board requested an invoice from Midlothian for the second installment in 2008. The invoice, dated November 19, 2008, indicated the total due was $33,246, and stated that "[p]ayments are based on 87% of Posen Library District's corporate levy, which in tax year 2007 was $66,950." Statements were generated on later dates as Posen made payments against the balance due. The statements were identical to the original invoice, with the exception that "Invoice" was replaced with "Statement" in the top right corner, the date was different, and notations were added below the amount due detailing Posen's actual payments. A statement dated January 12, 2009, shows that Posen paid $30,246 on January 6. A February 16, 2009 statement shows

- 4 -

a payment of $1,000 on February 14 and a final statement dated March 23, 2009, reflects payment of the balance of $2,000 on March 7. The record also contains an August 25, 2009 invoice that is identical to the November 19, 2008 invoice, and a statement also dated August 25, 2009, that includes the history of Posen's payments and the notation "Paid in full." The invoice for the second installment of 2008 appears to be the only invoice ever generated by Midlothian under these agreements.

¶ 16    In May 2009, the boards of both libraries had a joint meeting and Midlothian presented a sample contract proposing higher payments. According to Sharples, the discussion did not go well, Posen withdrew from the meeting, and the current contract expired. Posen then contracted with another library district for library services.

¶ 17    Midlothian calculated the amount of Posen's underpayment going back to 2001 and allegedly issued an invoice for the unpaid total sometime in 2009 and made several demands for payment. The record does not include this invoice or any other supporting documentation indicating that demands for payment were made. Sharples testified that Midlothian discussed internally the shortfall in payments sometime after the Midlothian referendum passed in 2007, but did not discuss requesting the shortfall from Posen for the previous years until "after the contract talks broke off" in May 2009. After it became clear that Posen was not going to renew, the decision was made to sue, "[b]ased on the fact that we had the numbers and the fact that they were going to contract with someone else for service."

¶ 18    On May 7, 2010, Midlothian filed a complaint alleging breach of contract and unjust enrichment. The complaint sought the amount of claimed underpayments totaling $173,297, prejudgment interest, and unpaid late fees from Posen residents in the amount of $14,996.49. There is no provision in any of the contracts obligating Posen to reimburse Midlothian for late fees incurred by Posen residents.

¶ 19    The parties filed cross-motions for summary judgment. The trial court granted Midlothian's motion for summary judgment on the issue of Posen's liability for breach of contract, the amount of past due payments, and delinquent library charges. A hearing was held solely on the issue of Midlothian's claim for prejudgment interest. Sharples testified at the hearing but no transcript of the hearing is included in the record. Following the hearing, the trial court entered judgment in favor of Midlothian for a total of $309,593.07. The award consisted of $173,297 in damages under the breach of contract count, $121,294.33 in prejudgment interest, and $14,996.49 in unpaid late fees. The trial court denied Midlothian's request for prejudgment interest prior to 2007.

¶ 20    Posen timely filed an appeal of the trial court's grant of summary judgment in favor of Midlothian and the judgment order against Posen, including prejudgment interest. Midlothian filed a cross-appeal, seeking nearly $550,000 in additional prejudgment interest. On appeal, the parties filed what is labeled a "Rule 323(D) Agreed Statement of Facts." But despite its caption, the statement indicates that the parties disagree on whether Sharples testified during the damages hearing that Midlothian demanded payment in August 2007. The parties also disagree as to the basis for the trial court's ruling on prejudgment interest, with Midlothian contending the trial court ruled that prejudgment interest accrued from the time it demanded payment and Posen contending that the award was calculated from the date Midlothian discovered the alleged underpayments.

ANALYSIS

¶ 22 On appeal, Posen contends the trial court erred in granting summary judgment in favor of Midlothian because the performance of the parties over a period of 10 years operated to modify the contract terms. As an extension of the contract modification argument, Posen also argues that because of Midlothian's conduct over the 10-year period and Posen's reasonable reliance on that conduct, Midlothian is equitably estopped from asserting claims against Posen. Posen further claims the trial court erred in dismissing its affirmative defenses of *laches* and accord and satisfaction raised in Posen's cross-motion for summary judgment. Finally, Posen challenges the trial court's award of prejudgment interest.

¶ 23 We reject Midlothian's argument that Posen's affirmative defenses have been forfeited because they were not pled in its answer. "A party may assert, without forfeiture concerns, affirmative defenses in a summary judgment motion, even after failing to file them in an answer." *Falcon Funding, LLC v. City of Elgin*, 399 Ill. App. 3d 142, 156 (2010). In Posen's cross-motion for summary judgment, it argued the affirmative defenses of equitable estoppel, accord and satisfaction, and *laches*. Therefore, these defenses have not been forfeited.

¶ 24 Summary judgment is appropriate when the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2012); *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id*. We review an order granting summary judgment *de novo*. *Id*. When the parties file cross-motions for summary judgment, the court is invited to decide the issues presented as a question of law. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28.

¶ 25 As an initial matter, Posen has not raised issues relating to the enforceability of the contracts (other than a claim–which is without merit–that Quirk may not have signed certain of the contracts), and has not challenged the interpretation of the payment term clause beyond characterizing the clause in its appellate brief as an "obscure and confusing equalized assessed valuation clause." Although we decline to base our decision on such issues because Posen has elected not to raise them, we note that the record before us raises serious concerns regarding the validity and enforceability of these contracts.

¶ 26 First, Midlothian has interpreted the payment clause in two different ways, ignoring at least one term in each interpretation. On the 2008 invoice, Midlothian states that the second installment is calculated based on 87% of Posen's corporate levy, ignoring the phrase "extended at the rate of .17% times the [EAV]." In contrast, in Sharples' 2002 memo and throughout this litigation, Midlothian has taken the position that the formula is simply EAV x .0017 x .87, with no consideration of the general corporate fund levy.

¶ 27 Second, no explanation was provided in the proceedings in the trial court for the phrase "extended at" or the relationship between the general corporate fund levy and the EAV. This court is left to speculate whether the payment terms constitute an indirect way of requiring Posen to increase its corporate fund levy whenever there is an increase in the EAV (in order to maintain an effective tax rate of 17 cents per $100 of the EAV of property within Posen's library district), or whether the phrase "extended at" renders the term "general corporate fund

levy" irrelevant. It is equally unclear whether Midlothian can require or Posen can commit to payment terms that are based on a fixed percentage of the EAV when the amount of Posen's general corporate fund levy is constrained by tax cap legislation (which was again not adequately explained in the proceedings below) and voter approval.

¶ 28 Under Midlothian's current interpretation of the contract terms, in the final year of the last contract, Posen contracted to pay Midlothian $96,639, almost $30,000 more than its entire general corporate fund levy of $66,950. The record shows that Midlothian wanted Posen to increase its levy and was frustrated that it had not done so, but it is not clear to this court whether, under the tax cap legislation and the requirement for voter approval of an increase, Posen could have increased its levy to cover the contract amount. Moreover, as previously noted, it is not clear whether Midlothian can contractually require Posen residents to pay a certain percentage of the EAV for library services or require Posen to increase its levy when any such increase requires voter approval in a referendum. But Posen, having accepted the benefits of its residents' access to library services from Midlothian, does not seek to invalidate its contracts with Midlothian; rather, by its arguments on appeal, Posen seeks to limit Midlothian's ability to retroactively claim that Posen systematically underpaid during the entirety of the parties' contractual relationship.

¶ 29 With these underlying observations in mind, we turn to Posen's arguments on appeal. At the outset we note that one of the biggest difficulties in evaluating the claims of the parties on appeal is the dearth of evidence produced in the trial court. As noted above, Midlothian's original director–who might have shed some light on the negotiation of the library services contract and, in particular, the formula for calculating second installment payments–is deceased. Her replacement, Sharples, has taken conflicting positions regarding how the payment formula operates. On Posen's side, its former board president's testimony is clouded by questions as to her veracity as a result of charges that she converted library funds to her own use and pervasive memory deficits caused by a stroke. To make matters worse, with few exceptions, neither side has any documentary evidence tending to prove or disprove their respective contentions. While, under normal circumstances, the absence of evidence in the record would work against Posen as the appellant (see *Foutch v. O'Bryant*, 99 Ill. 2d 389, 393 (1984); *Balough v. Northeast Illinois Regional Commuter R.R. Corp.*, 409 Ill. App. 3d 750, 770-71 (2011)), the evidentiary shortcomings we have identified undermine our confidence in the conclusion that Midlothian was entitled to judgment as a matter of law.

¶ 30 Midlothian notes that Posen's first argument–that the contracts were modified by the performance of the parties–was not raised in the proceedings below. It is well settled that issues not presented to the trial court cannot be raised on appeal. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996). But Posen has raised the issue of equitable estoppel, which essentially accomplishes the same result, *i.e.*, if Midlothian is equitably estopped from seeking additional amounts from Posen under the contracts, those contracts have effectively been modified. Therefore, to the extent that the performance of the parties could be considered to have estopped Midlothian from asserting claims against Posen, we will consider Posen's arguments relating to contract modification as part of its equitable estoppel argument.

¶ 31 "Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or

- 7 -

her position for the worse." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001). Estoppel is ordinarily a question of fact and only becomes a question of law where there is no dispute as to the material facts and only one inference can be drawn from those facts. *Byron Community Unit School No. 226 v. Dunham-Bush, Inc.*, 215 Ill. App. 3d 343, 351 (1991). The ultimate purpose of the doctrine is to prevent fraud or injustice. *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 986 (1997).

¶ 32     As Midlothian points out, estoppel is not normally permitted to be asserted against a government entity without some showing of extraordinary circumstances. See *Haeflinger v. City of Wood Dale*, 129 Ill. App. 3d 674, 677-78 (1984). The reason underlying this general rule is that when public revenues are at stake, estoppel is particularly disfavored. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 40. However, no case law in Illinois deals with the invocation of equitable estoppel in a case involving two government entities. "Illinois courts have traditionally stated that, in order to apply equitable estoppel against a municipality, there must be an act by a municipality that induces reliance by a *private party*." (Emphasis added.) *Id.* ¶ 39.

¶ 33     We do not believe a municipality is required to make a showing of extraordinary circumstances in order for equitable estoppel to apply to another municipality where public revenues are at stake for both sides. But even if such a showing was required, we believe extraordinary circumstances exist here. See *id.* ¶ 40 (requiring affirmative act by the municipality itself or an official with express authority to bind the municipality and reasonable reliance upon that act by the plaintiff inducing a detrimental change in position). It was within the authority vested in Sharples, as Midlothian's director, to calculate sums due from Posen under the contracts and it was reasonable for Posen to rely on Sharples for that purpose, which it clearly did as we discuss in more detail below. Although Posen's inability to pay is not a defense to an otherwise valid and enforceable contract, it is indeed extraordinary that under Midlothian's postcontract interpretation of the agreements, Posen obligated itself to pay sums for library services that exceed its general corporate levy by a large margin. Given that over a period of 10 years, Midlothian accepted Posen's payments without comment or complaint and affirmatively adopted a construction of the contracts it now disclaims, Midlothian's posttermination demands for the additional sums based on a construction of the contract never enforced over the history of the relationship in our view constitutes extraordinary circumstances. Thus, this is a situation in which equitable estoppel, if established by Posen, could apply against Midlothian, even though Midlothian is a municipality.

¶ 34     The parties set forth different elements of equitable estoppel. The case cited by Posen, *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 309-10 (1990), is inapposite because it defines the elements required to establish promissory estoppel. See *Gold v. Dubish*, 193 Ill. App. 3d 339, 348 (1989) ("While promissory estoppel requires proof of an unambiguous promise, equitable estoppel does not."). Both parties cite *Haeflinger*, where a party seeking to invoke the doctrine of equitable estoppel against a municipality must establish: (1) an affirmative act on the part of the municipality; (2) inducement of the complained-of action; and (3) a substantial change in position as a result of justifiable reliance on the affirmative act. *Haeflinger*, 129 Ill. App. 3d at 677-78. But neither party lists the elements required to establish equitable estoppel generally.

¶ 35    A party claiming equitable estoppel must demonstrate that: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel; (5) the party claiming estoppel reasonably relied upon the representations in good faith to its detriment; and (6) the party claiming estoppel has been prejudiced by its reliance on the representations. *Geddes*, 196 Ill. 2d at 313-14. The representation need not be fraudulent; it is sufficient that an unjust effect results from allowing another party to raise a claim inconsistent with its former declarations. *Id*. at 314. The test is whether, considering all the circumstances, conscience and the duty of honest dealing should deny a party the right to repudiate the consequences of its representations or conduct. *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 25 (citing *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 148 (1986)).

¶ 36    There is some similarity and overlap between the elements of equitable estoppel listed in *Haeflinger* relating specifically to a municipality and the general elements listed in *Geddes*. Whether Midlothian's conduct is characterized as an affirmative act or a misrepresentation or concealment of a material fact, Posen has established that an unjust effect will result if Midlothian is now allowed to raise a claim that is inconsistent with its previous representations or conduct.

¶ 37    Facts supporting the first element under both *Haeflinger* and *Geddes*–an affirmative act or a misrepresentation or concealment of a material fact–appear in the record. The evidence regarding the calculation of the second installment establishes that Midlothian informed Posen each year of the amount due and Posen paid the requested amount. Midlothian continued to provide library services and continued to renew the agreements as they expired without seeking to enforce its current interpretation of the contract terms and without informing Posen that Midlothian believed Posen was underpaying. These facts constitute proof of both an affirmative act on the part of Midlothian, as well as a misrepresentation or concealment of a material fact.

¶ 38    As for the second element under *Geddes*–Midlothian's knowledge that its representations were untrue–the record indicates that Sharples sent a memo as early as 2002 reflecting her interpretation of the contract terms and providing an amount due based on that interpretation, a calculation that Midlothian now states is incorrect. Therefore, Sharples was aware at that time of the EAV calculation Midlothian is now alleging must be performed to determine the amount of the second installment. Yet, in subsequent years, Midlothian did not calculate the amount due based on the EAV, but rather simply required Posen to pay 87% of its corporate fund levy as noted on the 2008 invoice. Sharples testified that sometime in 2007, after Midlothian residents passed a referendum doubling the amount they would pay for library services, she went back and performed this EAV calculation for 2006 and discovered an underpayment of close to $30,000. Sharples further testified that it was not until the auditors discovered that Posen only paid $25,000 instead of $33,246 as a second installment in 2007 that she went back and performed calculations for the years 2001 through 2007. However, even after this alleged "discovery" that Posen had underpaid, there is no evidence in the record that Midlothian changed its representations to Posen in any way. Sharples merely informed Posen of the alleged underpayment for 2006 and attempted to get Posen to increase

its levy so that it would be able to pay a higher amount. Midlothian accepted Posen's second installment payment in 2008 (eventually marking it "Paid in full"), and even issued an invoice stating that the amount was calculated based on 87% of the corporate fund levy rather than on the EAV basis Midlothian now claims. Therefore, Posen has adduced evidence establishing Midlothian knew that its representations regarding the amount of the second installment were untrue.

¶ 39 As for the remaining elements under both *Haeflinger* and *Geddes*–Posen's lack of knowledge of the incorrect calculation, its reliance on Midlothian's calculations to its detriment, and Midlothian's knowledge of that reliance–Posen has established that it was unaware of the misrepresentation and simply paid the amount Midlothian said was due, and it believed Midlothian did not expect Posen to pay any other amount (*Geddes*). Posen was induced to continue paying the amount it was told to pay by Midlothian (*Haeflinger*), and reasonably relied on Midlothian's conduct in entering into successive agreements as evidence that Posen's performance under the agreements was satisfactory (*Geddes*). Finally, evidence in the record supports the conclusion both that Posen was prejudiced (*Geddes*) and suffered a substantial change in position (*Haeflinger*) as a result of its reliance on Midlothian's conduct. When Midlothian proposed an agreement in 2009 requiring higher payments for library services, Posen decided not to renew and contracted with another district for library services. The fact that Posen was able to secure library services on more favorable terms for its residents beginning in 2009 supports the inference that had Midlothian disclosed its intention to demand amounts over and above those it informed Posen were due, Posen could have acted to terminate its relationship with Midlothian earlier.

¶ 40 We further note that the concept of equitable estoppel is not unknown in breach of contract actions. A contract may be modified by the specific understanding and conduct of the parties as to one or more of its provisions without affecting the liability of the parties under other terms. *Nagle v. General Merchandising Corp.*, 58 Ill. App. 3d 344, 347 (1978). Where a party to a contract changes the terms of the written contract and accepts performance on the contract as so changed, that party is estopped from asserting that the other party should have performed according to the terms of the written contract. *Id.* at 347-48.

¶ 41 It is also the law in Illinois that "[p]arties to a contract may waive provisions contained in the contract for their benefit and such waiver may be established by conduct indicating that strict compliance with those contractual provisions will not be required." *Wolfram Partnership Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 223 (2001). This prevents one party from lulling another into believing that strict compliance will not be required and then later filing suit seeking to enforce strict compliance. *Id.* at 223-24. "Implied waiver has been viewed as a concept based upon either waiver or estoppel and, accordingly, has been stated to arise where (1) an unexpressed intention to waive can be clearly inferred from the circumstances or (2) the conduct of the waiving party has misled the other party into a reasonable belief that a waiver has occurred." *Id.* at 224.

¶ 42 Because an equitable estoppel defense was available to Posen and Posen established the elements of that defense, the trial court erred in granting summary judgment in favor of Midlothian and denying Posen's cross-motion for summary judgment. Therefore, Posen is entitled to an entry of summary judgment in its favor.

¶ 43    We briefly address the other bases for reversal raised by Posen. Posen claims that the trial court erred in denying its *laches* defense. "*Laches* is an equitable principle which bars an action where, because of delay in bringing suit, a party has been misled or prejudiced or has taken a course of action different from what the party otherwise would have taken." (Internal quotation marks omitted.) *Osler Institute, Inc. v. Miller*, 2015 IL App (1st) 133899, ¶ 23. Posen contends that because Midlothian is only seeking to enforce its claims after 10 years, *laches* bars the suit. However, this defense is normally not available in an action at law on a contract given the 10-year statute of limitations for breach of contract. See 735 ILCS 5/13-206 (West 2012). Thus, Midlothian's delay in filing suit for an alleged breach of contract does not support the affirmative defense of *laches*.

¶ 44    Finally, we do not agree that Posen has a valid defense on the basis of accord and satisfaction between the parties. An accord and satisfaction is a contractual method of discharging a debt or claim and requires: "(1) a *bona fide* dispute, (2) an unliquidated sum, (3) consideration, (4) *a shared and mutual intent to compromise the claim*, and (5) an execution of the agreement." (Emphasis added.) *Saichek v. Lupa*, 204 Ill. 2d 127, 135 (2003). The "accord" is the agreement between the parties and the "satisfaction" is the execution of that agreement. *Id*. Moreover, because it is contractual in nature, the intent of the parties is of central importance. *Id*. "Accord and satisfaction presuppose that the parties disputed the amount due but agreed to give and accept something other than that which they thought was due in order to settle a claim." *Id*. at 136.

¶ 45    The debtor bears the burden of showing that the creditor intended to accept the payment in settlement of the dispute; in the absence of such a showing, the payment only operates as a discharge to the extent of the amount paid. *Boyer v. Buol Properties*, 2014 IL App (1st) 132780, ¶ 56 (citing *Solomon v. American National Bank & Trust Co.*, 243 Ill. App. 3d 132, 135 (1993)). The acceptance and negotiation of a check tendered with notice that it is in full payment of all demands is an accord and satisfaction. *A.F.P. Enterprises, Inc. v. Crescent Pork, Inc.*, 243 Ill. App. 3d 905, 911 (1993).

¶ 46    The trial court correctly rejected Posen's argument based on accord and satisfaction as the necessary elements of that defense are not present here. Although Sharples informed Posen in 2007 of an underpayment of $30,000 for 2006, there is no evidence in the record that Midlothian demanded payment of this amount or the amount it now claims is owed for any other year until after Posen contracted with another village for library services. Midlothian did not file this action until May 7, 2010, and there is nothing in the record to indicate that Midlothian informed Posen of the amount it is now claiming it was owed under previous contracts prior to payment of the second installment for 2008. Moreover, contract renewal negotiations between the parties did not fail until May 2009, three months after Posen paid the amount of the 2008 invoice in full.

¶ 47    We note that Midlothian's own documentation regarding the second installment payment for 2008 creates confusion and could lead to an inference that Midlothian did, in fact, accept Posen's second 2008 installment payment as full satisfaction of its claim. The invoice was issued in November 2008 and Posen paid the total balance by March 2009. The current contract did not expire until June 30, 2009, and contract renewal negotiations failed in May 2009. Sharples testified that Midlothian did not discuss requesting the alleged underpayment from Posen going back to 2001 until after the contract talks failed and it was clear that Posen was not going to renew. Yet Midlothian issued another copy of the November 2008 invoice

dated August 25, 2009, and a statement with the same date containing the notation "Paid in full." Because Midlothian has taken the position that it was well aware of the amount of the alleged underpayments prior to 2008, it could be inferred that its conduct in issuing an invoice in 2008 for the lesser amount and a statement in 2009, after the contract talks failed, with the indication that the balance had been paid in full evidenced an intent to accept the 2008 second installment payment as satisfaction of its claim.

¶ 48     But as we have noted, the burden is on Posen to show the payment was *tendered* as full satisfaction of the disputed amount, which requires a conspicuous statement on the instrument itself or an accompanying written communication that the payment is tendered as full satisfaction of the claim. See 810 ILCS 5/3-311(a), (b) (West 2012). The record contains no evidence that any of Posen's payments included such a statement. Posen has further provided no evidence of any agreement between the parties that payment of the second installment invoice for 2008 would satisfy Midlothian's claim for additional monies allegedly due under the agreements. See *Boyer*, 2014 IL App (1st) 132780, ¶ 56 (the burden is on the debtor to show the creditor intended to accept the payment as settlement of the dispute). Thus, Posen's payment of the 2008 invoice only operates as a discharge of the amount paid.

¶ 49     The case relied on by Posen is inapposite. In *Quaintance Associates, Inc. v. PLM, Inc.*, 95 Ill. App. 3d 818 (1981), the payment that was found to be an accord and satisfaction was accompanied by a letter stating the defendant would only pay 60% of the disputed amount and considered the matter closed; therefore, the court concluded that the plaintiff understood the check was offered as a compromise and settlement. Lacking comparable circumstances here, Posen has not established a valid defense on accord and satisfaction grounds.

¶ 50     Because the trial court also granted summary judgment on the issue of unpaid delinquent fees, we must also consider whether Midlothian is entitled to summary judgment on that issue. Midlothian's complaint requested $14,996.49 in delinquent library charges and other fees accrued by Posen residents, pursuant to section 4-7 of the Illinois Local Library Act (Library Act) (75 ILCS 5/4-7 (West 2012)). Section 4-7 provides that "if a contract is for the supply of library services for residents without a public library ***, the terms of that contract *** will provide for the assumption by the contracting party receiving the services of financial responsibility for the loss of or damage to any library materials provided to non-residents under the contract." 75 ILCS 5/4-7(8) (West 2012).

¶ 51     Although the exhibit provided by Midlothian in support of its request for delinquent library charges merely consists of a list of names showing the amount owed by each individual, Sharples filed an affidavit in which she attests that this total represents "lost and missing" library materials. Thus, it would appear that the total sought by Midlothian is proper under the statute despite Midlothian's use of the phrase "delinquent library charges" in its complaint, a phrase which could simply indicate unpaid late fees for library materials that were eventually returned.

¶ 52     But, fatal to this aspect of Midlothian's claims, the contracts do not, in fact, provide for the assumption of financial responsibility by Posen for the loss of or damage to library materials as required by the Library Act. The Library Act itself does not purport to create a cause of action if the contracting party does not assume responsibility for the loss of library materials provided to nonresidents under the contract. Rather, the Library Act states that the terms of the contract will provide for the assumption by the contracting party for lost

materials. Midlothian filed a breach of contract action but the contracts it drafted failed to include the provision contemplated by the Library Act and do not contain any other provision that would allow it to recover these amounts. Midlothian cannot rely on the language of the statute to create contract terms that it failed to include in the contracts themselves. Therefore, the trial court erred in granting summary judgment on the issue of charges for missing or damaged library materials.

¶ 53                                                         CONCLUSION

¶ 54      The affirmative defense of equitable estoppel is available to Posen despite the fact that Midlothian is a municipality because both entities are municipalities, public revenues are at stake for both parties, and, in any event, Posen has demonstrated exceptional circumstances. Moreover, Posen has established an affirmative misrepresentation or concealment of a material fact by Midlothian, Midlothian's knowledge that its representations were untrue, Posen's lack of knowledge of the incorrect calculations, its reliance on Midlothian's calculations to its detriment and the resulting prejudice because of its reliance, and Midlothian's knowledge of that reliance. Finally, because the contracts were silent on the issue of assuming responsibility for lost or damaged library materials, Midlothian does not have the ability to recover those sums pursuant to the Library Act. Thus, the trial court erred in granting summary judgment in favor of Midlothian and denying Posen's cross-motion for summary judgment.

¶ 55      The order granting summary judgment to Midlothian and denying Posen's cross-motion for summary judgment is reversed. We remand the cause to the circuit court for entry of an order granting Posen's cross-motion for summary judgment.

¶ 56      Reversed and remanded with directions to enter summary judgment in favor of defendant-appellant.