In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-2108

PNC BANK, NATIONAL ASSOCIATION,

*Plaintiff-Appellee,*

*v.*

SAMUEL G. BOYTOR AND CAROL A. BOYTOR,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-04167 — **Sunil R. Harjani**, *Judge.*

_____

ARGUED FEBRUARY 7, 2024 — DECIDED JULY 16, 2024

_____

Before WOOD,[*] LEE, and PRYOR, *Circuit Judges.*

LEE, *Circuit Judge.* Samuel Boytor is a well-educated engineer and businessman who founded several companies that supply component parts to machinery manufacturers. In the process of running these companies, Mr. Boytor took out

_____

[*] Circuit Judge Diane P. Wood retired effective May 1, 2024, and did not participate in the decision of this opinion, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

loans with EFS Bank (EFS). Both he and his wife Carol personally guaranteed this debt. The Boytors eventually defaulted and entered into a settlement agreement with EFS's successor bank to restructure their obligations. As part of the settlement, they signed three new promissory notes secured by mortgages on their commercial and residential properties. After a series of mergers, PNC Bank, National Association (PNC) eventually became the holder of these notes.

Even after the settlement agreement, the Boytors struggled to pay their debts. In June 2018, PNC filed a two-count complaint against the Boytors related to their default on two of the notes associated with the settlement. In Count I, PNC moved to foreclose on the Boytors' residential property, which was subject to PNC's mortgage securing a $203,000 note. In Count II, PNC moved for the entry of a money judgment for the nonpayment of a separate $200,000 note. After a two-day bench trial in May 2021, the district court found for PNC on both counts. A sale was held on the Boytors' residential property, and in January 2023 the district court issued a final judgment confirming the sale and entering a deficiency judgment. The Boytors appealed. We now affirm the judgment in favor of PNC on both counts.

## I. Background

### A. The Settlement Agreement

Samuel and Carol Boytor reside in Gilberts, Illinois, a small community northwest of Chicago. Together, they own residential property at 822 Tipperary Street (the Tipperary Property). Mr. Boytor holds a bachelor's degree in biochemistry and a graduate degree in medical engineering. After working several engineering jobs early in his career, he started his

own company called Fox Controls that supplies automation components to machinery manufacturers. He later created a division of Fox Controls—called Safe-T-Sense—specializing in safety components. Safe-T-Sense eventually became its own entity separate from Fox Controls. Mr. Boytor operated these companies out of a factory he built at 11N026 Rippburger Road in Plato Center, Illinois (the Rippburger Property).

To support his companies, Mr. Boytor borrowed money from EFS, which through a series of mergers[1] became PNC in 2009. Both the Boytors personally guaranteed this debt. After they struggled to pay back the loans, the Boytors and Mid America (one of PNC's predecessor banks) entered into a settlement agreement on March 10, 2006.

At a high level, the settlement agreement between the bank and the Boytors restructured the over $1,200,000 the Boytors owed to Mid America. Under the terms of the settlement, the couple agreed to secure $300,000 in financing from Minarik Corporation (Minarik), which they would then pay to Mid America to reduce their existing obligations. In exchange, Mid America would release the lender liens it held against the assets of Fox Controls and Safe-T-Sense. The parties also agreed to three new notes as part of the settlement: (1) a $600,000 note secured by a first mortgage on the Boytors' Rippburger Property, (2) a $200,000 note secured by a junior mortgage on the Rippburger Property, and (3) a $405,000 note

---

[1] In February 2006, EFS Bank merged with Mid America Bank, FSB (Mid America). Then, in February 2008, Mid America merged with National City Bank (National City). National City subsequently merged with PNC in November 2009. For clarity, any reference to "PNC" includes PNC's predecessor banks, where appropriate.

secured by a first mortgage on the Boytors' Tipperary Property. Unlike traditional notes, the Boytors did not receive the full cash value in exchange for these obligations. Instead, the proceeds from the notes went toward paying off existing mortgages and real estate costs, then toward paying down the Boytors' existing borrower obligations to Mid America.

The parties executed the $200,000 note and junior mortgage on the Rippburger Property on April 20, 2006. Then, the next day, the parties amended the terms of the March 10 settlement agreement. The modified agreement deleted the paragraph providing for the $405,000 note and first mortgage on the Tipperary Property. In its place, the parties added a new $203,000 note, secured by a junior mortgage on the Tipperary Property. The parties executed the new $203,000 note and mortgage on April 24, 2006.

### B. Subsequent Developments

After the parties entered into the amended settlement agreement, the Boytors still struggled to meet their obligations to Mid America. On January 25, 2007, Mid America and the Boytors entered into a temporary forbearance agreement related to the Boytors' failure to pay the money due on the $200,000 and $600,000 notes. As part of the agreement, Mid America agreed to waive any default arising from the failure to pay if the Boytors paid $10,000 to the bank each month during the forbearance period.

On July 14, 2008, Jacalyn Brennan, an asset manager for National City (which had merged with Mid America), issued two payoff letters to the Boytors for the $600,000 and $200,000

notes.[2] Later that month, the Boytors began a new lending relationship with American Chartered Bank (American Chartered). On July 31, 2008, the Boytors executed one promissory note with American Chartered for $850,000 and another for $650,000. According to the Boytors, they used the proceeds from these new loans to pay off both the $200,000 and $600,000 notes. Although the evidence is not conclusive, the record suggests that the Boytors paid National City the money due on the $600,000 note.[3] Unlike the $600,000 note, however, the $200,000 note remained active and the banks' loan systems indicated that it was still outstanding, even after the Boytors received the proceeds from their loans from American Chartered.

Despite this, National City released the junior mortgage on the Rippburger property that secured the $200,000 note on August 6, 2008. The record is unclear as to why the bank released the mortgage. PNC Asset Manager James Hayden testified at trial that banks sometimes release mortgages without being paid on the underlying note as part of settlement negotiations. For example, a bank might release a mortgage so that a new lender can secure a senior lien on the same property if

---

[2] As its name implies, a payoff letter is a document that shows the amount a lender has to actually pay to complete their loan obligations to a bank.

[3] At trial, James Hayden—an asset manager for PNC—explained that during one of the mergers, the acquired bank likely transferred documentation only for active loans, which resulted in the acquiring bank obtaining documents for the $200,000 but not the $600,000 note. Based on this and other information available to him, Hayden concluded that the Boytors had paid off the $600,000 note.

the bank knows the proceeds of the new loan would be used to pay down the debtor's obligations with the bank.

Several significant events followed. On April 3, 2009, Brennan signed a Managed Assets Status Change and 1099 Reporting Form (1099 Reporting Form) recommending that the bank move the $203,000 note to "dead" status.[4] Brennan testified that she moved the $203,000 note to "dead" status because she mistakenly thought it was duplicative of the $200,000 note, even though it was not. That same day, Brennan and the Boytors signed a note modification agreement on the $200,000 note, extending the maturity date to April 3, 2011. Then, on July 8, 2009, the Boytors again granted a new mortgage to National City on their Tipperary Property to secure the $200,000 note.

The Boytors continued to fall short of meeting their payment obligations over the next eight years. In 2009, 2010, 2014, and 2016, PNC sent letters to the Boytors advising them that they were in default and requesting payment on the notes. In 2017, Hayden obtained the Boytors' loan file. After some investigation, he realized that the $203,000 note was mistakenly moved to "dead" status despite being a valid note. Hayden confirmed with his colleagues that the bank had never sent an IRS Form 1099[5] to the Boytors, and PNC subsequently decided to pursue collection of the note.

---

[4] "Dead" status is an internal designation that generally means a bank stops pursuing the note for collection. Moving a loan to dead status, however, does not mean that the debt is no longer owed or that the bank cannot pursue collection later if it decides to do so.

[5] When a bank forgives a debt, it must send both the Internal Revenue Service and the debtor an IRS Form 1099 reporting the cancelled debt.

### C. Procedural History

On June 15, 2018, PNC sued the Boytors for defaulting on the $200,000 and $203,000 notes. Count I of the complaint sought foreclosure of the mortgage securing the $203,000 note, while Count II sought a money judgment for nonpayment of the $200,000 note. The district court held a two-day bench trial on May 25 and May 26, 2021.[6]

On September 10, 2021, the district court found for PNC on both counts. As to Count I, the district court held that PNC satisfied its initial burden of foreclosure by presenting the mortgage and the underlying note. The Boytors countered with two affirmative defenses, but the district court found they failed to meet their burden on both. As for their defense that the $203,000 lacked consideration, the court concluded that the Boytors' argument was inconsistent with the language of the settlement agreement and the amendment to the agreement. The court also rejected the Boytors' affirmative defense that they had paid the money due on the $203,000 note, finding the argument at odds with other evidence in the record.

Next, the district court found that PNC proved its Count II breach of contract claim related to the $200,000 note. As with the foreclosure count, the district court rejected each of the Boytors' affirmative defenses. First, the Boytors pointed to a recital contained in the release of the $200,000 mortgage, but the court found other evidence indicating the Boytors had never paid the note more persuasive. Second, the court determined that the release extinguished only the bank's right to

---

[6] The trial proceeded before the magistrate judge to whom the parties consented in accordance with 28 U.S.C. § 636.

the security for the $200,000 note, not the Boytors' obligation on the note itself. Lastly, the court rejected the Boytors' affirmative defense of accord and satisfaction because the Boytors had not demonstrated that the bank had agreed that the Boytors could pay less than the amounts actually owed on the notes.[7]

Based on these findings, the district court ordered the foreclosure proceedings to proceed, and a sale was held on the Boytors' residential property in September 2022. PNC was the highest bidder. On May 9, 2023, the district court entered final judgment confirming the sale and deficiency judgment.[8] The Boytors timely appealed.

## II. Analysis

We review the district court's legal conclusions following a bench trial *de novo* and its factual findings for clear error. *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016); *see also* Fed. R. Civ. P. 52(a)(6). In particular, the district court's credibility determinations "command a high

---

[7] The district court also rejected the Boytors' affirmative defenses to Count II based on waiver and estoppel. The Boytors appear to have abandoned these defenses on appeal. Therefore, we need not discuss them further.

[8] The district court initially entered a final judgment of foreclosure and sale, terminating the civil case on September 28, 2021. In its January 31, 2023, order, however, the district court noted that it should not have entered final judgment the previous September, because mortgage foreclosure orders are not final appealable judgments until the court confirms the sale of the property. *HSBC Bank USA, N.A. v. Townsend*, 793 F.3d 771, 777 (7th Cir. 2015). As a result, the district court vacated its September 28, 2021, final judgment and entered the operative final judgment on May 9, 2023.

degree of deference." *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) (quoting *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009)). Indeed, we will not "disturb a court's evaluation of witness credibility unless the court has credited patently improbable testimony or its credibility assessments conflict with its other factual findings." *Id.* (quoting *Gicla*, 572 F.3d at 414).

Because we are sitting in diversity,[9] we apply state substantive law and federal procedural law. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). The parties agree that Illinois substantive law governs.

### A. Count I

In Count I, PNC seeks foreclosure on the Tipperary Property pursuant to 735 Ill. Comp. Stat. 5/15-1101. Under Illinois law, a bank such as PNC can initiate foreclosure proceedings upon "either the debt's maturity or a default of a condition in the instrument." *Heritage Pullman Bank v. Am. Nat'l Bank & Tr. Co. of Chi.*, 518 N.E.2d 231, 235 (Ill. App. Ct. 1987). A mortgagee establishes a *prima facie* case for foreclosure by introducing the mortgage and underlying note. *PNC Bank, Nat'l Ass'n v. Zubel*, 24 N.E.3d 869, 875 (Ill. App. Ct. 2014). Then, the

---

[9] The Boytors are citizens of Illinois; PNC is a national banking association with its principal office in Pennsylvania. "All national banking associations," 28 U.S.C. § 1348 states, "shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located." 28 U.S.C. § 1348; *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006) (holding that, for diversity jurisdiction purposes, a national bank is located in the state where it has its main office, not in every state where it has branch offices). Thus, PNC is a citizen of Pennsylvania, and the amount in controversy exceeds $75,000, so our jurisdiction is secure. 28 U.S.C. § 1332(a).

burden shifts to the mortgagor to prove any applicable affirm-
ative defenses. *Id.* The Illinois foreclosure statute also requires
that the complaint include a copy of the mortgage and under-
lying note as exhibits and that the complaint allege certain de-
tails about the mortgage. 735 Ill. Comp. Stat. 5/15-1504(a).

The district court found that PNC satisfied its initial bur-
den establishing foreclosure, and the Boytors do not challenge
that finding on appeal. Instead, the Boytors contest the district
court's refusal to credit their two affirmative defenses. First,
the Boytors argue that the $203,000 note and mortgage are un-
enforceable because they lacked consideration. Second, they
claim that there was no default prompting foreclosure be-
cause they had paid the money due on the $203,000 note. And,
as a corollary, the Boytors argue that the $203,000 note never
existed independent of the $200,000 note in the first place (that
note forms the basis for Count II). We consider each of these
arguments in turn.

### i.  Lack of Consideration

The Boytors first contend that there was no consideration
for the $203,000 note. In order for a contract to be enforceable,
"the promisee must have given some consideration for the
promise." *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619,
624 (Ill. App. Ct. 2005) (quoting *Gibson v. Neighborhood Health
Clinics, Inc.*, 121 F.3d 1126, 1130 (7th. Cir. 1997)). In Illinois,
consideration "consists of some detriment to the offeror, some
benefit to the offeree, or some bargained-for exchange be-
tween them." *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 679
n.9 (7th Cir. 2005). "[C]ourts will not inquire into the ade-
quacy of the consideration" as long as "the person receives
something of value in exchange for her own promise or

detriment." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996).

Essentially, the Boytors insist that because they executed the $203,000 note and mortgage several days after they executed the terms of the original agreement, PNC needed to provide additional consideration for the $203,000 note. But the record is clear that the amendment *was* supported by new consideration. Most significantly, the proceeds of the $203,000 note went toward paying expenses on the existing $203,000 mortgage and then toward paying down the Boytors' existing debt with PNC. The terms of the $203,000 note also gave the Boytors two years to pay the bank with zero interest until the maturity date. Thus, the Boytors' contention that the $203,000 note lacked consideration finds no support in record.

### ii. Payment of the $203,000 Note

The Boytors' second affirmative defense is that they paid the money due on the $203,000 note. They rely on two pieces of evidence: (1) the language of four mortgage releases the bank executed in 2008, and (2) the bank's Disbursement Request and Authorization Form that says $203,000 was paid to Mid America. Whether the Boytors paid the $203,000 note is a factual finding that we review for clear error. *See Bridgeview*, 816 F.3d at 938. Since a release of a mortgage is a contract, we review the district court's interpretation of a release *de novo*. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 720 (7th Cir. 2003).

We begin with some necessary background. National City executed four releases on August 6, 2008: (1) the release of the junior $200,000 mortgage on the Rippburger Property, (2) the release of the $600,000 first mortgage on the Rippburger

property, (3) the release of a $600,000 assignment of rents, and (4) the release of a $200,000 assignment of rents. The Boytors point to the boilerplate language in the releases, stating that:

> National City … for and in consideration of the payment of the indebtedness secured by the Mortgage Deed hereinafter mentioned … does hereby REMISE, CONVEY, RELEASE, and QUIT CLAIM unto Samuel G Boytor and Carol A Boytor … all the right, title, interest, claim or demand whatsoever it may have acquired in, through or by a certain Mortgage Deed[.]

Specifically, they argue that the term "indebtedness" in the releases refers to the defined term "Indebtedness" in each mortgage. And since the mortgages define "Indebtedness" broadly to include debts secured by the mortgages' cross-collateralization provisions, the Boytors contend that these four releases effectively released their underlying debt on their $203,000 mortgage, even though the Boytors did not release that specific mortgage.

The language in the mortgage releases, however, undercuts this theory. Each release refers to the "indebtedness *secured by the Mortgage Deed hereinafter mentioned*." This leaves no doubt that the clause refers to payment of the debt underlying the mortgage *being released*, not all of the Boytors' debt to the bank.

The second piece of evidence the Boytors offer is a Disbursement Request and Authorization Form which states that "$203,000 [was] paid to MidAmerica Bank in settlement of Fox Controls, Inc. obligations." But this form does not support the Boytors' argument that they paid the $203,000 note. To the

contrary, the statement indicates only that the *proceeds* of the new note were paid to Mid America as part of a refinancing of the Boytors' existing debt. It does not in any way suggest that the Boytors paid their obligation under the new note.

Other than the releases and the Disbursement Request and Authorization Form, the Boytors have offered no evidence that they actually paid the $203,000 note.[10] For example, they have not offered a copy of a check, check stub, payment receipt, or withdrawal record indicating they paid the note. PNC, for its part, points to various pieces of evidence suggesting that the $203,000 note was never paid, including letters sent to the Boytors notifying them that money was still owed on the note. The district court also found Mr. Boytor's testimony claiming to have paid the $203,000 note unconvincing, instead crediting Hayden's testimony that the note remained unpaid in 2017 when he took over the Boytors' file. In sum, the district court's conclusion that the Boytors did not pay the $203,000 note has ample support in the record and was not clearly erroneous.

### iii. Whether the $203,000 Note Was Duplicative

The Boytors also argue that they owe no obligation on the $203,000 note because it was duplicative of the $200,000 note. The district court rejected this argument as well, concluding that the $200,000 and $203,000 notes were separate instruments. Whether the two notes were duplicative is a finding of

---

[10] The consideration recitals in the releases are not dispositive, because the court can look to other evidence to determine whether the notes were in fact paid. *See Polo Nat'l Bank v. Lester*, 539 N.E.2d 783, 786 (Ill. App. Ct. 1989). We discuss this point in more detail later.

fact that we review for clear error. *See Bridgeview*, 816 F.3d at 938.

In March 2006, the parties entered into a settlement agreement providing for three notes, including a $405,000 note secured by a first mortgage on the Tipperary Property and a $200,000 note secured by a junior mortgage on the Rippburger Property. Four days later, the parties amended the agreement, removing the provision regarding the $405,000 note and mortgage and adding a new note for $203,000 secured by a junior mortgage on the Tipperary Property. The $200,000 note in the original agreement was left unchanged. The only reasonable conclusion to be drawn from these documents is that the final settlement agreement included both the original $200,000 note and the new $203,000 note, which was added as part of the amendment.

The Boytors primarily rely on Mr. Boytor's own sworn testimony that he thought the $203,000 note was a mistake and had no idea where it came from. But the district court found this testimony implausible for several reasons. First was Mr. Boytor's status as "a well-educated and sophisticated businessperson." Second, in the court's words, "Mr. Boytor's claim that he has 'no idea' where the $203,000 note and mortgage came from is belied by the fact that he signed the amendment to the settlement agreement which explained the genesis of the $203,000 note and mortgage." Third, the district court noted that Mr. Boytor "went on to sign the $203,000 note and mortgage, at which time, he specifically negotiated for a 15-day cure period to resolve any default in payment." We see no reason to set aside these well-supported factual findings.

The Boytors also point to the 1099 Reporting Form as evidence that the two notes were duplicative. In that form,

Brennan requested that the $203,000 note be moved to "Dead" status, explaining that both notes got booked "[i]n error." But at trial, Brennan testified that her initial understanding was mistaken because, at the time she submitted the form, she had not seen the amendment to the settlement agreement providing for the $203,000 note. The district court reasonably credited this testimony, and we will not disturb it on appeal.

The Boytors' final argument is that it would have been nonsensical for them to have agreed to the $203,000 note because it would have increased their debts beyond their remaining obligations with the bank. As they see it, their $300,000 payment to Mid America (financed through their new loan with Minarik) plus the $600,000, $200,000, and $203,000 notes would amount to more than the $1.2 million they owed. But, focusing on the $600,000 note, the district court concluded that the full amount had not gone toward paying the Boytors' outstanding obligations. Instead, only $31,309.35 of the $600,000 went toward their obligations, while the rest reduced the over $550,000 the Boytors had owed the bank on a preexisting Rippburger mortgage. The district court's thorough analysis is backed by the evidence, including a disbursement form confirming that only $31,309.35 was applied to the Boytors' debts as part of the settlement.

Because the district court did not err in finding that the Boytors failed to establish any of their affirmative defenses to Count I, we affirm the district court's judgment of foreclosure on the Tipperary Property.

## B.  Count II

Count II of PNC's complaint seeks a money judgment for nonpayment of the $200,000 promissory note. To prevail on a breach of contract claim under Illinois law, a plaintiff must establish by a preponderance of the evidence: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158–59 (7th Cir. 2015) (quoting *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012)). The Boytors raised four defenses to Count II before the district court: payment, release, waiver, and estoppel. They also argued that the doctrine of accord and satisfaction extinguished any obligation they might have had under the $200,000 note.

The district court granted judgment to PNC on its breach of contract claim, rejecting all of the Boytors' affirmative defenses. The Boytors contest on appeal the court's rulings related to payment, release, and the doctrine of accord and satisfaction.

### i.  Payment

The Boytors first argue the district court erred in finding that they had not paid the $200,000 note. In support, they offer two pieces of evidence. First, they point to two July 31, 2008, promissory notes with American Chartered for $850,000 and $650,000. According to the Boytors, these new notes establish that they had the money available to pay off the $200,000 note. Second, they point to the consideration recital in the August 2008 release of the $200,000 mortgage. During oral argument, the Boytors' attorney urged that these two pieces of evidence—combined with simple "common sense"—prove that

they paid the note. Whether the Boytors actually paid the note is a finding of fact that we review for clear error. *See Bridgeview*, 816 F.3d at 938.

Unfortunately for the Boytors, common sense does not lead us to the same conclusion. First, there is no evidence that they actually used the funds from American Chartered to pay off their debt; mere availability of funds is not enough to show how the funds were used. The Boytors have offered no check, payment receipt, or cancelled loan note connecting the new loan money to the payment of the $200,000 note.[11]

The Boytors' reliance on the August 2008 release of the $200,000 mortgage fares no better. Specifically, they argue that because the document says that the release was made "in consideration of the payment of the indebtedness secured by the Mortgage Deed," this means they must have paid the underlying $200,000 debt. Under Illinois law, however, this language is not dispositive. Instead, "[e]xtrinsic evidence is permissible to show that the recital of consideration in a deed or other like document contract is not the actual consideration." *Polo Nat'l Bank*, 539 N.E.2d at 786. And here, the Boytors' actions after execution of the release are markedly inconsistent with the contention that they had paid the $200,000 note. For instance, in April 2009—eight months after the release—the Boytors entered into an agreement to extend the maturity date of the $200,000 note. Then, in August 2009, the Boytors

---

[11] The only evidence the Boytors cite is Mr. Boytor's insistence that they had paid the $200,000 note. The district court chose not to credit this testimony, given that Mr. Boytor only had a "very faint memory of the events concerning the loans" and that he "could not provide specific details about the transactions." This was not clear error. *Morisch*, 653 F.3d at 529.

granted the bank a new mortgage on their home as security for the $200,000 note. We agree with the district court that these subsequent actions indicate that the Boytors never paid the note.

Other evidence buttresses this conclusion. For one, the banks' records still recorded the $200,000 note as outstanding, and the bank also retained possession of the physical note.[12] What is more, between 2009 and 2016, PNC and its predecessor banks sent at least five letters to the Boytors notifying them they were in default on the $200,000 note, none of which were contested. Based on this evidence, the district court did not clearly err when it found that the Boytors had not paid the $200,000 note.

### ii. Release

The Boytors also argue that the release of the $200,000 mortgage on the Rippburger Property released the bank's rights *both* to the mortgage and to the underlying note. As stated, the relevant release provided that National City:

> does hereby REMISE, CONVEY, RELEASE, and QUIT CLAIM unto Samuel G Boytor and Carol A Boytor … all the right, title, interest, claim or demand whatsoever it may have acquired in, through or by a certain Mortgage Deed bearing date of the 20th day of April A.D. 2006 and recorded May 8, 2006 … as document No. 2006K048628.

---

[12] Hayden testified that PNC's customary practice when a note is paid is to remove the note from the bank's system, and, if requested by the borrower, mark the note as paid and return it to the borrower.

The meaning of the release is a question of contract interpretation that we review *de novo*. *Chemetall*, 320 F.3d at 720.

The Boytors' argument misapprehends the relationship between a mortgage and an underlying note. In Illinois, "[t]he release of a mortgage amounts only to the release of an interest in or lien on the mortgaged property. *Daiwa Bank, Ltd. v. LaSalle Nat'l Tr.*, 593 N.E.2d 105, 116 (Ill. App. Ct. 1992). "In and of itself, such a release does not necessarily mean that other rights the parties may have under the mortgage agreement are extinguished." *Id.* Instead, a release "should be given a fair and reasonable interpretation based on consideration of all its language and provisions." *Weidner v. Szostek*, 614 N.E.2d 879, 881 (Ill. App. Ct. 1993). Here, the only fair and reasonable interpretation is that the release operated only to release the bank's security interest in the property for the underlying note—not the note itself.

### iii. Accord and Satisfaction

Finally, the Boytors argue that their obligation to pay the $200,000 note was extinguished under the doctrine of accord and satisfaction. An accord and satisfaction "is a contractual method of discharging a debt or claim and requires: '(1) a bona fide dispute, (2) an unliquidated sum, (3) consideration, (4) a shared and mutual intent to compromise the claim, and (5) an execution of the agreement.'" *Bd. of Libr. Trs. of Vill. of Midlothian v. Bd. of Libr. Trs. of Posen Pub. Libr. Dist.*, 34 N.E.3d 602, 615 (Ill. App. Ct. 2015) (emphasis omitted). The debtor has the burden of proving these elements. *Id.* Whether there was an accord and satisfaction is a mixed question of law and fact that we review for clear error. *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016).

The Boytors argue that the four releases the bank executed in August 2008 manifest that they had fully satisfied their debt to PNC. But as discussed, the August 2008 releases only released the interest in the collateral securing the underlying notes—not the notes themselves. We agree with the district court's finding that there is "[q]uite simply … no evidence that the parties came to a new arrangement wherein the Boytors would pay less for their outstanding debt."

We have considered the Boytors' remaining arguments on appeal, but none merit discussion. Because the district court did not err in finding that the Boytors had not established any of their affirmative defenses to Count II, we affirm the court's deficiency judgment related to the $200,000 note.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.