In the

# United States Court of Appeals

## For the Seventh Circuit

No. 25-2341

RATEB KHOURI,

*Plaintiff-Appellant,*

*v.*

HIGHLAND PARK CVS, LLC, and CVS PHARMACY INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-08975 — **Franklin U. Valderrama**, *Judge.*

SUBMITTED APRIL 8, 2026 — DECIDED JUNE 11, 2026

Before SCUDDER, ST. EVE, and KOLAR, *Circuit Judges.*

ST. EVE, *Circuit Judge*. Rateb Khouri alleges he sustained
serious injuries in the Highland Park CVS store when bever-
age bottles flew off a collapsing cooler shelf and struck him,
knocking him to the ground. Khouri blames Highland Park
CVS, LLC, and CVS Pharmacy Inc. (collectively "CVS") for
negligently causing his injuries. After a five-day bench trial,
the district court ruled in CVS's favor, finding Khouri's negli-
gence claim failed. Khouri now appeals that decision and

challenges several of the district court's evidentiary rulings. Because Khouri failed to show CVS negligently caused his injuries and the district court did not abuse its discretion in limiting evidence and testimony at trial, we affirm.

## I. Background

### A. Factual Background

The district court made the following factual findings based on evidence presented during the bench trial. Except where indicated, the factual findings are largely unchallenged on appeal.

### 1. CVS Beverage Cooler Structure and Maintenance

The tall beverage cooler involved in this incident was one of approximately twenty at the Highland Park CVS store, each with a glass front door that swings open. Inside the coolers, beverages rest on shelves that are slanted slightly down towards the front so that more bottles slide into place when the front bottle is removed. Hooks, or "teeth," on the sides of each cooler shelf fit into slots in the sides of the cooler to secure the shelf at the desired frontward-slanting angle. Plastic guards along the front of each shelf prevent the bottles from falling off the front of the slanted shelves.

Each shelf inside a cooler can hold up to sixty-three bottles, so the shelves are very heavy when fully stocked. Moving a fully stocked shelf is therefore extremely difficult, if not impossible, so CVS employees do not attempt to lift or move the shelves. Instead, most cooler shelf maintenance falls to the independent vendors who provide beverage products to CVS. At the time of Khouri's incident, three vendors provided beverage products for CVS, altogether contributing 80–90% of the products in CVS's beverage coolers. CVS products made up

the remaining 10–20%. In general, CVS employees are responsible for maintaining and restocking the CVS products in the cooler shelves while the vendors are responsible for vendor products.

Vendors deliver and stock their own products in the CVS store. A salesperson for each vendor visits CVS about once a week to check on stock and place product orders, and then the vendors deliver the products on weekdays. A CVS employee scans the products before the vendor restocks the cooler shelves with them, but the employees typically do not oversee the vendor restocking process. If the vendor places an item in the wrong place, a CVS employee will not move it, but instead will tell the vendor to do so.

The vendors also perform "resets" of the beverage coolers once a year, which involve removing and cleaning the shelves before replacing them in the coolers. The yearly resets are the only time the cooler shelves are moved. CVS employees do not oversee the reset, which can take about six hours.

For their part, CVS employees stock CVS products in the coolers, rotating them so the oldest products are towards the front and newest at the back. There is no evidence rotating the products in the Highland Park CVS store ever caused a shelf to become loose or dislodged. CVS employees do not touch the cooler shelves while restocking because the shelves are the vendors' responsibility. For example, product vendors, not CVS employees, are responsible for fixing shelf guards that become broken and would not notify CVS managers if they did so.

Beyond stocking their own products, CVS employees have limited interaction with the beverage coolers. They may rotate

the front bottles at the end of each day to ensure the labels are facing forward, affix sale stickers to the coolers weekly, and change prices on select cooler items about once a month. CVS employees are also expected to wipe down the front of the glass doors every two weeks and spot-clean the outside of the cooler doors when dirty. But for the most part, only the vendors clean the shelves during the yearly reset. If a product spills between resets, a vendor will clean up its own products, while a CVS employee will clean up spills from CVS products. At the time of Khouri's accident, the shelf that fell contained both CVS and vendor products.

CVS employees also have the general responsibility to walk through the store several times a day to ensure the store is clean, restock products, and address any concerns they see.

### 2. The Incident

On May 7, 2016, a Saturday, Khouri entered the Highland Park CVS store to purchase a bottle of water. He walked to the back of the store and opened a beverage cooler door to grab a bottle. Khouri did not see anything amiss with the cooler shelf when he approached it. He did not notice any shelf askew or loose, nor did he see any bottles tipped on their sides. But when he picked up a bottle, several other bottles fell out and struck Khouri, knocking him backward into a metal shelf and then onto the floor. Approximately fifty to seventy-five bottles fell out of the cooler and onto the floor.

At the time of Khouri's incident, Pat Szczerba was the CVS store manager on duty, and Charlene Galazin was a shift supervisor. Szczerba had worked at various CVS store locations since 2003, and at the Highland Park CVS as a manager since 2011. Galazin had worked as a shift supervisor at the

Highland Park CVS since 2006. Galazin and Szczerba were both at the front of the store when they heard a loud crash from the cooler aisle. Szczerba ran to the cooler aisle where he encountered Khouri and saw numerous bottles on the floor in front of one of the coolers. He noticed an upper shelf in that cooler had collapsed onto the shelf below it. Szczerba cleaned up the bottles and slid the fallen cooler shelf back into place. He noted the shelf in question slid and locked into place easily inside the beverage cooler. Szczerba testified he had not seen anything wrong with any of the cooler shelves during his shift that Saturday, nor had anyone reported a defect to him, and he did not know why the shelf had fallen. He had never seen a cooler shelf fall like this or needed to adjust a malfunctioning shelf at any CVS store where he had worked. Indeed, neither Szczerba nor Galazin had ever seen a cooler shelf out of place or loose within the cooler.

Szczerba helped Khouri to the front of the store, where Khouri called for an ambulance and complained to the paramedics of hip and ankle pain.

### B. Procedural Background

In November 2017, Khouri filed a single-count complaint in the Cook County Circuit Court alleging CVS negligently caused his injuries. CVS removed the case to federal district court in December 2017 on the basis of diversity jurisdiction. Several years of fact and expert discovery ensued, and the court twice denied CVS's motions for summary judgment on the negligence claim. Relevant here, the court granted CVS's challenge to the testimony of Emmanuel Ramos, Khouri's expert witness, on issues of notice and causation because his opinions constituted legal conclusions on outcome-determinative issues for which he had no basis to testify.

Upon the bench trial's conclusion, the court entered its detailed findings of fact and conclusions of law and entered judgment in favor of CVS. Specifically, the court determined Khouri failed to prove CVS was negligent under the *res ipsa loquitur* doctrine. Khouri now challenges the district court's *res ipsa loquitur* analysis as well as several evidentiary rulings. None of Khouri's arguments succeed, so we affirm.

## II. Legal Standard

Following a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error. *PNC Bank, Nat'l Ass'n v. Boytor*, 109 F.4th 495, 503 (7th Cir. 2024); *see also* Fed. R. Civ. P. 52(a)(6). The district court's credibility determinations command an especially high degree of deference, and we will not "disturb a court's evaluation of witness credibility unless the court has credited patently improbable testimony or its credibility assessments conflict with its other factual findings." *PNC Bank*, 109 F.4th at 503 (quoting *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011)).

## III. Discussion

Khouri challenges the district court's *res ipsa loquitur* analysis finding no negligence, its refusal to admit an interrogatory answer into evidence, and its limitation of his expert witness's testimony. We address each argument in turn.

### A. Negligence Analysis: *Res Ipsa Loquitur*

To establish negligence under Illinois law,[1] a plaintiff must show that the defendant owed him "a duty of care, that

---

[1] Because we are sitting in diversity (Khouri is an Illinois citizen, CVS is a Rhode Island citizen, and the amount in controversy exceeds $75,000),

it breached that duty, and that the breach proximately caused his injuries." *Smith v. United States*, 860 F.3d 995, 998 (7th Cir. 2017) (citing *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 270 (Ill. 2007)). The parties do not dispute the duty or causation elements, only whether CVS breached its duty to Khouri.

A plaintiff can establish that a business owner breached its duty by showing the owner negligently caused the dangerous condition that injured him or had notice of a dangerous condition and failed to remedy it. *Newsom-Bogan v. Wendy's Old Fashioned Hamburgers of New York, Inc.*, 953 N.E.2d 427, 431 (Ill. App. Ct. 2011). Khouri's appeal focuses on the first of these, arguing CVS negligently caused the shelf to collapse. Absent direct evidence on this point, Khouri relies on the doctrine of *res ipsa loquitur* ("the thing speaks for itself") to establish negligence.

The *res ipsa loquitur* doctrine allows "proof of negligence by circumstantial evidence" when the plaintiff has no direct evidence of negligence. *Johnson v. Armstrong*, 211 N.E.3d 355, 367 (Ill. 2022). Under *res ipsa loquitur*, "[w]hen a thing which caused an injury is shown to be under the control or management of the party charged with negligence and the occurrence is such as in the ordinary course of things would not have happened if the person so charged had used proper care, the accident itself affords reasonable evidence … that it arose from want of proper care." *Id.* (quoting *Metz v. Cent. Ill. Elec. & Gas Co.*, 207 N.E.2d 305, 307 (Ill. 1965)). A plaintiff relying on *res ipsa loquitur* must prove that he was injured "(1) in an occurrence that ordinarily does not happen in the absence of

---

we apply state substantive law. *PNC Bank*, 109 F.4th at 503. The parties agree that Illinois substantive law governs.

negligence [and] (2) by an agency or instrumentality within the defendant's exclusive control." *Id.* at 367–68 (quoting *Heastie v. Roberts*, 877 N.E.2d 1064, 1076 (Ill. 2007)). The parties' disagreement on appeal hinges solely on the exclusive control element.

Under Illinois law, "exclusive control" does not require the defendant to assert total physical control over the injurious instrumentality to the exclusion of all others. The requisite control standard is instead "a flexible one in which the key question is whether the probable cause of the plaintiff's injury was one which the defendant was under a duty to the plaintiff to anticipate or guard against." *Id.* at 369 (quoting *Heastie*, 877 N.E.2d at 1076). The term "'control' may itself be misleading," as the inquiry is not so much fixated on the defendant's literal control over the occurrence as the defendant's responsibility for it. *Johnson*, 211 N.E.3d at 369. In other words, we ask whether "the apparent negligent cause of the accident [is] such that the defendant would more likely than not be responsible for it." *Id.* (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 39, at 250–51 (5th ed. 1984)).

Meeting the control element becomes more complicated in cases where it is clear *someone* has been negligent but unclear which party is at fault. We typically cannot say, for purposes of *res ipsa loquitur*, that a defendant was responsible—more likely than not—for a plaintiff's injury where it is equally plausible another party negligently caused the injury.[2] *Britton*

---

[2] Illinois courts observe an exception to this general rule when the injury arises during a surgery. *See, e.g.*, *Kolakowski v. Voris*, 415 N.E.2d 397, 401 (1980). Because this case does not involve an injury sustained during surgery, we need not worry about this exception.

*v. Univ. of Chi. Hosps.*, 889 N.E.2d 706, 709 (Ill. App. Ct. 2008); *see also Heastie*, 877 N.E.2d at 1077 (explaining that "where evidence support[s] plausible explanations for the [injury] other than negligence by the defendant," the plaintiff cannot meet the control element of *res ipsa loquitur* (citing *Bernardi v. Chi. Steel Container Corp.*, 543 N.E.2d 1004, 1013 (Ill. App. Ct. 1989))). In *Britton*, for example, *res ipsa loquitur* did not apply because the plaintiff—who was injured when a hospital revolving door shattered on him—could not show it was more likely that the hospital, rather than one of the many third parties who used the revolving door each day, negligently caused the door to shatter. 889 N.E.2d at 709. The hospital was not in "exclusive control" of the door such that it was responsible for the plaintiff's injury. *Id.* The court explained, "if two reasonable inferences are deducible from the same facts, one of which comports with defendant's responsibility and the other is directly *contra* thereto, neither should be indulged to permit recovery by use of the doctrine." *Id.* Where the evidence does not point one way or the other, applying *res ipsa loquitur* to impose liability on a party at random would allow the factfinder to impermissibly "enter the field of speculation and engage in a guessing contest." *Id.*

Relying on *Britton*, the district judge found that the evidence showed a third-party beverage vendor was just as likely to have caused the shelf to collapse as was a CVS employee, and so rejected Khouri's *res ipsa loquitur* argument.

But before we proceed to our own analysis of the facts, a brief point on the applicable standard of review: Whether *res ipsa loquitur* applies at all "is a question of law to be decided in the first instance by the trial court." *Johnson*, 211 N.E.3d at 368 (citing *Imig v. Beck*, 503 N.E.2d 324, 329 (Ill. 1986)). If the

doctrine applies, it "permits, but does not compel, the trier of fact to find that the defendant acted negligently." *Lynch v. Precision Mach. Shop, Ltd.*, 443 N.E.2d 569, 573 (Ill. 1982). The fact-finder weighs the permissive inference alongside any evidence the defendant provides[3] in opposition, and ultimately "is free to accept or reject the inference." *Johnson*, 211 N.E.3d at 367–68; *see also Heastie*, 877 N.E.2d at 1082. The decision of how to weigh and resolve the inference against opposing evidence is a factual determination. *Imig*, 503 N.E.2d at 329.

Typically the distinction between the legal conclusion and factual decision regarding *res ipsa loquitur* is clear because the judge renders legal conclusions while the jury makes factual findings. But in a bench trial, where the judge both draws the legal conclusions and finds the facts, the distinction can grow murky. *See, e.g., Green v. Shah*, No. 1-14-1512, 2015 WL 8773060, ¶ 32 (Ill. App. Ct. Dec. 14, 2015) ("[T]he record is not clear as to whether the trial court found plaintiff failed to prove the two elements or whether plaintiff did prove the two elements and defendant presented enough evidence at trial to overcome the permissive inference raised by *res ipsa*

---

[3] Khouri argues that CVS was required (and failed) to "rebut" his prima facie negligence claim with its own evidence. But "the evidentiary and procedural consequence of *res ipsa loquitur* . . . is not that of a rebuttable presumption but, rather, that of the creation of a *permissible inference* or deduction of negligence from the facts and circumstances of the case." *Imig*, 503 N.E.2d at 330. The burden is "on the plaintiffs to prove that the accident was caused by some act of negligence by the defendant[]" and that burden "never shift[s] to the defendant[]." *Id.* If the plaintiff chooses to sustain his burden by relying on *res ipsa loquitur*, that "simply permits the drawing of an inference as in any other case of circumstantial evidence" but "does not create a presumption of negligence" that must be unequivocally rebutted. *Id.*

*loquitur*."). The parties dispute whether the district court's *res ipsa loquitur* decision was a legal conclusion, to be reviewed de novo, or finding of fact, reviewed for clear error.

Here, even assuming the district court made a legal determination, we affirm the district court's ruling. Illinois law on *res ipsa loquitur* counsels easily against applying the doctrine in this case because Khouri failed to submit proof to trigger the application of the doctrine. As in *Britton*, the evidence here shows a third party's negligence was just as likely as CVS's to have caused Khouri's injury. 889 N.E.2d at 709.

The evidence shows the third-party vendors had restocking responsibilities similar to CVS employees', restocked at least weekly, and restocked 80–90% of the beverage products in CVS's coolers. No evidence indicated which party had most recently restocked the cooler shelf at issue. While the third-party vendors restocked a much higher quantity of beverage brands overall, CVS restocked more frequently, so either party could have been the last to restock the shelf at issue before Khouri opened the cooler and retrieved his drink. Further, the third-party vendors interacted with the shelves by cleaning up spills caused by their products and were the only parties to ever fully remove, clean, and replace the shelves during the yearly reset. Though the vendors had not performed a reset in 11 months at the time of Khouri's incident, there was no evidence that CVS employees had ever removed the shelves or replaced them at any point. Further, CVS employees rarely touched the cooler shelves, and they had no oversight over the third-party vendors' interactions with the shelves. If the shelf fell because of pressure applied during restocking or because someone placed it in the cooler

incorrectly, the third-party vendors were just as likely—if not more so—to have compromised the shelf's stability.

The facts here stand in contrast to those in *Smith v. United States*, where a chair in an interview room owned, maintained, and secured by the government malfunctioned and injured the detainee seated on it. 860 F.3d 995, 1000 (7th Cir. 2017). There, previous detainees (the only other parties who could have caused the malfunction) interacted with the chair only by sitting on it, while the government was responsible for inspecting, repairing, and moving the chairs as needed. *Id.* By contrast, the third-party vendors have at least as much responsibility over the cooler shelves as CVS employees. Nor did CVS employees have sufficient direction and command over the third-party vendors to establish control over any actions those vendors took regarding cooler shelf placement. *Cf. Lynch*, 443 N.E.2d at 573–74 (*res ipsa loquitur* applied where independent contractor exerted total supervision and control over the injurious mechanism and all other parties who worked on it). The vendors' interactions with the shelves do not involve supervision or control by CVS.

Khouri argues the evidence of the vendors' actions does not matter because the exclusive control prong does not require him to eliminate other possible causes of the shelf's collapse. But he confuses the more lenient pleading standard with the evidentiary burden applicable at trial. *See Heastie*, 877 N.E.2d at 1077. To hold CVS liable using *res ipsa loquitur* at trial, Khouri needed to put forth evidence showing that CVS, rather than a third party, was more likely the negligent party. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 17 (2010) ("[F]urther information is typically needed [] to establish that any one of the [potentially liable entities] was

probably the negligent party. In the absence of such further information, *res ipsa* claims against any of the parties are properly rejected."). He did not produce that evidence.

Khouri also attempts to discredit the evidence of the third-party vendors' substantial involvement with the beverage coolers by contending it is based solely on the self-serving testimony of CVS employees. But the district court found the CVS employees' testimony credible and weighed it accordingly. We see no basis to disturb these findings. *PNC Bank*, 109 F.4th at 503 ("[W]e will not 'disturb a court's evaluation of witness credibility unless the court has credited patently improbable testimony or its credibility assessments conflict with its other factual findings.'" (quoting *Morisch*, 653 F.3d at 529)).

In sum, an Illinois tort plaintiff cannot rely on *res ipsa loquitur* where "control of or responsibility for" the injurious mechanism "was plainly divided between" the defendant and another party. *Bernardi*, 543 N.E.2d at 1013; *see also Britton*, 889 N.E.2d at 709. The doctrine "applies only when the facts proved by the plaintiff admit of the single inference that the accident would not have happened unless the defendant had been negligent." *Britton*, 889 N.E.2d at 709. Khouri failed to prove those facts. *See id.*

## B. Exclusion of Interrogatory Answer

Khouri next argues that the district court erroneously refused to admit into evidence CVS's response to one of his interrogatories. We review the court's evidentiary ruling on this matter for abuse of discretion and will reverse only if "no reasonable person could take the view adopted by the trial court." *Davies v. Benbenek*, 836 F.3d 887, 889 (7th Cir. 2016).

At trial, Khouri's counsel sought to admit into evidence the following interrogatory question and answer:

[Khouri]: Provide the name(s) and address of any persons or entities you allege contributed to Plaintiff's injuries.

[CVS]: None at this time. Investigation continues.

The district court correctly found the interrogatory answer did not admit CVS's liability or rule out third-party vendor liability, and did not abuse its discretion in excluding it. The interrogatory merely asks CVS to provide names, not say for certain whether anyone contributed to Khouri's injuries. And even if the interrogatory explicitly asked CVS to indicate whether other parties could have been responsible, CVS's answer indicates lack of knowledge, not certainty that no one else was involved. Further, stating that the "investigation continues" shows that CVS thought another party could have been responsible and planned to continue looking into it— why else would they continue investigating? CVS's non-answer was not an admission of liability and was not otherwise probative.

Khouri also argues for the first time on appeal that CVS should have supplemented its initial interrogatory answer to name the vendors once CVS learned of their involvement so Khouri could have interviewed the vendors or joined them as defendants. *See* Fed. R. Civ. P. 26(e) ("A party who has … responded to an interrogatory … must supplement or correct its disclosure or response … if the party learns that in some material respect the disclosure or response is incomplete or incorrect …."). But having failed to raise this argument below, Khouri has waived it on appeal. *See Crothersville Lighthouse*

*Tabernacle Church, Inc. v. Church Mut. Ins. Co.*, 168 F.4th 483, 491 (7th Cir. 2026).

**C. Limits on Ramos's Testimony**

Finally, Khouri argues that the district court erred by limiting the testimony of his expert witness, Emmanuel Ramos, a long-time Walgreens employee. Khouri contends that the district court limited Ramos's testimony by (1) failing to consider some of the statements he made about whether an employee would notice a faulty shelf, and (2) refusing to consider the expert's legal conclusions. Both arguments fail.

Start with Ramos's testimony regarding notice. During cross-examination, Ramos testified as follows:

> [Counsel for CVS]: So you would agree with me that if a shelf is set in a cooler, somehow some way improper, it can go unnoticed for days at a time, correct?
>
> [Ramos]: Yes, correct.
>
> Q: And no one will notice anything about that shelf until it falls?
>
> A: Yes, unless, unless it's one side, like I was explaining earlier, that it is slanted towards one side of the shelf, which, you know, which to the naked eye you can see that it's off.
>
> …
>
> Q: But my question is it seems like you're talking about two different things. You're talking about a situation where you walk upon a shelf and you see that it's somehow not level?
>
> A: Right. Correct.

…

Q: What I am talking about is if it is set in there incorrectly, it can look proper as you look at it, and you won't know about it until it falls?

A: Correct.

Ramos revisited the same topic during his redirect with Khouri's counsel:

[Counsel for Khouri]: [I]n terms of how Walgreens operates, if people are doing their job as they're supposed to, would a shelf that's not put in properly, would it, would you expect it to go unnoticed for days?

…

[Ramos]: You would tell by the appearance of the shelf.

Khouri argues the district court ignored the second segment of Ramos's testimony when it found that an improperly placed shelf is not always visually apparent and could go unnoticed for days, absolving CVS of constructive notice.

But the district court reasonably construed all portions of Ramos's testimony, which described two different scenarios where a shelf may be placed incorrectly: one where the shelf is obviously askew and thus noticeable by the employees, and one where the shelf is placed improperly but looks perfectly proper to the naked eye. Especially given Khouri's testimony that the shelf looked normal when he approached, it was not clearly erroneous for the court to conclude an improperly placed shelf would not always appear so. *See Ill. Liberty PAC v. Madigan*, 904 F.3d 463, 475 (7th Cir. 2018) ("The clear-error standard for factual findings entered after a bench trial is 'highly deferential.'" (quoting *Morisch*, 653 F.3d at 528)).

Neither did the district court abuse its discretion in excluding Ramos's testimony that the "shelf toppling was caused by a CVS employee," and that "an employee should have noticed the condition of the shelf." The district court rightly held these statements were outcome-determinative legal conclusions and properly excluded them from evidence. Ramos was free to offer expert testimony on the circumstances surrounding the shelf collapse, including what caused other shelf collapses in his experience at Walgreens, how an improperly installed shelf would look to an employee, what a responsible employee would be expected to do if they saw an improperly installed shelf, and what kinds of interactions an employee would have with the cooler shelves. The court prevented him only from drawing the legal conclusions that a CVS employee must have caused the shelf to fall and would have been on notice of an improperly installed shelf. The district court's decision thus nimbly allowed for expert testimony that would "embrace[] an ultimate issue," Fed. R. Evid. 704(a), while preventing Ramos from offering "legal conclusions that [would] determine the outcome of the case," *Good Shepherd Manor Found., Inc., v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

\* \* \*

The judgment of the district court is

AFFIRMED.